54 F.3d 664
 67 Fair Empl.Prac.Cas. (BNA) 1739,
66 Empl. Prac. Dec. P 43,668
Sharon H. BALL, formerly known as Sharon H. Kanzler,
Plaintiff-Appellant,
v.
David RENNER, in his individual and official capacities,
Defendant-Appellee,
City of Cheyenne, Wyoming, Defendant.
 No. 94-8064.
 United States Court of Appeals,
Tenth Circuit.
 May 10, 1995.
 
 1
 Terry L. Armitage, Sr. Asst. Atty. Gen., Cheyenne, WY, for defendant-appellee.
 
 
 2
 Jane Villemez of Graves & Villemez, P.C., Cheyenne, WY, for plaintiff-appellant.
 
 
 3
 Before SEYMOUR, Chief Judge and ANDERSON, Circuit Judge and SHADUR, Senior District Judge.*
 
 
 4
 SHADUR, Senior District Judge.
 
 
 5
 Sharon Ball ("Ball") initially sued her former employer City of Cheyenne ("Cheyenne") and its then Sergeant David Renner ("Renner"). Because Ball has not appealed the district court's entry of summary judgment in Cheyenne's favor on the claims that she had advanced against it, we deal only with the action as between Ball and Renner.
 
 
 6
 In that respect Ball asserted two claims against Renner: one charging sexual harassment, actionable under Title VII of the Civil Rights Act of 1964 ("Title VII," 42 U.S.C. Secs. 2000e to 2000e-17[1]), and the other a Wyoming state law claim for intentional infliction of emotional distress. After reviewing the parties submissions on Renner's motion for summary judgment under Fed.R.Civ.P. ("Rule") 56, the district court granted that motion:
 
 
 7
 1. on Ball's Title VII claim on the grounds (a) that she had failed to name Renner in her Equal Employment Opportunity Commission ("EEOC") charge and (b) that Renner was not an "employer" within the meaning of Title VII; and
 
 
 8
 2. on Ball's state law claim on the ground that Renner's alleged conduct was not sufficiently outrageous.
 
 
 9
 We affirm the first of those rulings and reverse the second, instead ordering the dismissal of the state law claim without prejudice to its reassertion before a state tribunal.
 
 Background
 
 10
 On July 2, 1982 Ball began work as a dispatcher for the Cheyenne Police Department, where Renner was a police officer. Over time Ball and Renner developed a relationship that was pleasant enough until March 1991, when Renner's behavior toward Ball changed drastically. Although the record evidence tendered by Ball is more graphic and more extensive, for current purposes we need not elaborate on the capsule description contained in the Intake Questionnaire that Ball filed with the Wyoming Fair Employment Practices Commission:
 
 
 11
 Over 2 (two) month period of time Sgt. Dave Renner followed me home numerous times from work at 4:00 am. Continually tried to put his arm around me. Once grabbed me and attempted to dance. Finally came into dark closet with me, shut the door, twice, even after I pushed him away the first time, then came back after I had gotten out of closet and placed his crotch on my right leg just below the knee. Sgt Renner was told almost every time to either "quit," "knock it off," or "leave me alone," after each physical contact. As a result of him following me home I was forced to take alternate routes home and run inside my house with him sometimes waiting outside for me.
 
 
 12
 That dark-closet incident occurred on May 1, 1991. Ball stopped working five days later, complaining of depression and post-traumatic stress, and resigned officially as of August 14, 1991.
 
 Standard of Review
 
 13
 We review the grant of summary judgment de novo, applying the same standard used by the district court (Considine v. Newspaper Agency Corp., 43 F.3d 1349, 1356 (10th Cir.1994)). Under Rule 56(c) summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Familiar Rule 56 principles impose on Renner as movant the initial burden of establishing the lack of a genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986)). In making that determination we, like the district court, are required to draw all reasonable inferences in the light most favorable to nonmovant Ball (Considine, 43 F.3d at 1356).
 
 
 14
 Once Renner has satisfied that initial burden, Ball cannot stave off summary judgment merely by stating that some "genuine" and "material" factual issue is in dispute. Instead the burden shifts to her to demonstrate the existence of a material issue by identifying specific facts in the record sufficient to create the possibility that a reasonable factfinder might adopt her view (id.). Finally, "[w]e may affirm the grant of summary judgment for reasons other than those used by the district court so long as they are adequately supported by the record" (Bolden v. PRC Inc., 43 F.3d 545, 548 (10th Cir.1994)).
 
 Supervisor Liability
 
 15
 Who may be sued under Title VII? Ball claims that Renner harassed her sexually.[2] May she recover against him individually, or was her only potential avenue of relief against Cheyenne? That question has proved surprisingly difficult for the courts to resolve. For an understanding of the status of the issue in this Circuit, it is useful first to provide a brief canvass of the relevant statutory provisions and the decided case law elsewhere.
 
 
 16
 Section 2000e-2(a) provides (emphasis supplied):
 
 
 17
 It shall be an unlawful employment practice for an employer--
 
 
 18
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....
 
 
 19
 Section 2000e-5(b) provides that the victim of any such discrimination may bring administrative charges against the "employer" involved, and Section 2000e-5(f) permits legal action to be brought against the respondent to those charges after the necessary administrative steps have been taken. Finally Section 2000e(b) defines "employer" to mean (emphasis supplied):
 
 
 20
 a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such person....
 
 
 21
 "Agent" is not defined in Section 2000e(b) or elsewhere in the statute. Perhaps more importantly, nothing is said in the statute about why an "agent" should be listed as an "employer"--a principal--to begin with.
 
 
 22
 Given that statutory silence, courts have interpreted the inclusion of "agent" in the Section 2000e(b) definition of "employer" in two distinct ways:
 
 
 23
 1. as deepening the pool of potential defendants under Title VII to include supervisory and management personnel who discriminate in the workplace, or
 
 
 24
 2. as merely broadening the circumstances in which corporations and other organizational employers that otherwise meet the 15-employee threshold and the industry-affecting-commerce requirement may be liable, by ensuring that the discriminatory acts of individuals are imputed to the employing entity.
 
 
 25
 According to the first approach, the agency phrase imposes liability not only against the "employer" in the traditional common-law sense but also downstream against individuals who are directly responsible for the discriminatory conduct. According to the second, the phrase serves only to assure that respondeat superior liability operates properly against the actual employer. Outside of this Circuit the decisions are widely divergent (what follows is of course exemplary rather than exhaustive):
 
 
 26
 1. Some Courts of Appeals have lined up on one side or the other--compare the decisions in the Fourth Circuit (Paroline v. Unisys Corp., 879 F.2d 100, 104 (4th Cir.1989)) and Sixth Circuit (Jones v. Continental Corp., 789 F.2d 1225, 1231 (6th Cir.1986)), holding individuals liable, with those in the Ninth Circuit (Miller v. Maxwell's Int'l, Inc., 991 F.2d 583, 587 (9th Cir.1993)), holding that individual defendants cannot be liable under Title VII.
 
 
 27
 2. Some Courts of Appeals appear to have sent somewhat mixed or evolving signals--in the Fifth Circuit, contrast Hamilton v. Rodgers, 791 F.2d 439, 442-43 (5th Cir.1986) (holding supervisors in charge of staffing and assignments liable) with the later decisions in Harvey v. Blake, 913 F.2d 226, 227-28 (5th Cir.1990) (holding that a municipal supervisor could be sued in official capacity only) and Grant v. Lone Star Co., 21 F.3d 649, 651-52 (5th Cir.1994) (extending that principle to the branch manager of a private employer); and in the Eleventh Circuit, contrast Cross v. Alabama, No. 92-7005, 1994 WL 424303, 1994 U.S.App. LEXIS 23673, at * 36 (11th Cir. Aug. 30), petition for rehearing en banc pending (imposing individual liability) with Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir.1991) (per curiam) (holding a superior officer not individually liable); and see also Quillen v. American Tobacco Co., 874 F.Supp. 1285, 1296 (M.D.Ala.1995) (suggesting that Cross "made a sharp departure from past precedent").
 
 
 28
 3. Where Courts of Appeals have not ruled directly,[3] district courts have reflected intracircuit splits--in the Second Circuit, see Donato v. Rockefeller Fin. Servs., 93 Civ. 4663 (LLS), 1994 WL 695690, 1994 U.S.Dist. LEXIS 17709, at * 5-* 11 (S.D.N.Y. Dec. 12) (stating that weight of authority in Circuit favors individual liability) and Whitaker v. Port Auth. of New York & New Jersey, 88 CIV 4395 (SS), 1993 WL 410169, 1993 U.S.Dist. LEXIS 14477, at * 18 n. 11 (S.D.N.Y. Oct. 14) (describing the district court split); and in the Seventh Circuit, see Jendusa v. Cancer Treatment Centers of America, Inc., 868 F.Supp. 1006, 1008-09 (N.D.Ill.1994) (canvassing district court cases).[4]
 
 
 29
 All courts that give a downstream interpretation to the "agent" phrase distinguish between co-workers and supervisors/managers in order to limit liability to those who wield employer-like authority (e.g., to hire, to fire, to assign work). That of course makes good sense, for the very word "agent" carries the connotation of someone acting within his or her authority (although of course the exercise of that authority by engaging in sexual harassment involves the abuse of such authority--in a sense creating the seemingly oxymoronic concept of the unauthorized exercise of authority[5] ).
 
 
 30
 As for the other interpretation--the one that explains the "agent" phrase as aimed at the application of respondeat superior principles to impose Title VII liability on the actual employer--it makes little sense in analytical terms. After all, by definition a corporate or other organizational employer can act only through its agents in any event (what other meaning can be given to the concept that Mammoth Enterprises, Inc. has engaged in employment discrimination?). Thus Section 2000e-2(a), with its prohibition against discrimination by an "employer," necessarily embodies respondeat superior principles on its own. There is no need to define an agent of an employer as also being an "employer" in order to accomplish what is already built into the substantive prohibition against discrimination. Again by contrast, giving the "agent" phrase its literal meaning--that is, as making the responsible agent a statutory "employer" who is prohibited by Section 2000e-2(a) from discriminatory conduct and is rendered liable by Section 2000e-5(f) for violating that prohibition--is eminently sensible as a matter of statutory structure and logical analysis.
 
 
 31
 To turn to this Circuit's cases that have at least touched on the issue, it must be said that the waters are not entirely clear. That is amply demonstrated by this Court's two most recent applications of the "agent" as "employer" concept: in Sauers v. Salt Lake County, 1 F.3d 1122, 1124-25 (10th Cir.1993) and then in Brownlee v. Lear Siegler Management Servs. Corp., 15 F.3d 976, 978 (10th Cir.1994). Sauers read the "agent" phrase as permitting an agent for an employer to be sued under Title VII, but it then said that any such suit had to be construed as an official-capacity lawsuit against the actual "employer"--hence negating any personal liability on the part of the agent. But just six months later Brownlee (emphasis in original, relying in material part on Owens v. Rush, 636 F.2d 283, 286-87 (10th Cir.1980)) said that "a principal's status as an employer can be attributed to its agent to make the agent statutorily liable for his own age-discriminatory conduct"[6]--indicating that personal liability does exist on the part of the agent. Because it is always better for a court to address any legal issue only when it is necessary to the decision, thus avoiding the risk that a more generalized expression of views may not anticipate all the possible ramifications of an expression by way of dictum (see Justice Brandeis' famous concurrence in Ashwander v. TVA, 297 U.S. 288, 346-47, 56 S.Ct. 466, 482-83, 80 L.Ed. 688 (1936), expounding that principle as to constitutional law questions), and because further analysis shows that Brenner is not liable here even if the approach suggested in Brownlee were to control,[7] we need not and do not seek to resolve the open question.
 
 
 32
 That is so because of the already-stated principle, applied by all courts that hold Title VII liability may be imposed on "agents" as though they were themselves "employers," that those agents must be the equivalent or near-equivalent of true employers: persons who exercise employer-like functions vis-a-vis the employees who complain of those persons' unlawful conduct. On that score the only proof that Ball has tendered is an affidavit, sworn to by her on September 17, 1993, that provides in relevant part:
 
 
 33
 5. Through my training and my experience, it was my understanding that, as a dispatcher and a communication coordinator, my direct supervisor on night shift was the patrol sergeant on duty. It is my further understanding that the patrol sergeant on duty was in charge of all employees on the night shift.
 
 
 34
 6. It was my understanding that, due to the fact that the patrol sergeant on duty was the only available person above me in the chain-of-command, the patrol sergeant on duty was in charge of the radio room.
 
 
 35
 7. The patrol sergeant on duty has supervisory authority over all dispatchers including the dispatch supervisor.
 
 
 36
 8. As the communications coordinator on duty and being in control of the radio room, the patrol sergeant on duty could, in fact, send me home if he believed it was necessary.
 
 
 37
 9. As the communications coordinator on duty, my chain-of-command was through the patrol sergeant and this was made clear to me through my training.
 
 
 38
 10. As commissioned supervisor, the patrol sergeant on duty had authority over all civilian personnel.
 
 
 39
 11. In the Spring of 1991, Sgt. David Renner was assigned to night shift as a patrol sergeant on duty and had supervisory authority over me.
 
 
 40
 Even with the requisite reasonable inferences that are called for in Ball's favor on a summary judgment motion, those things do not reflect the kind of employer-employee equivalence in the relationship between Renner and Ball that would be required to trigger Renner's liability even under the reading of the Title VII statute most favorable to Ball. Generalized characterizations of Renner's asserted supervisory authority contained in paragraphs 5 ("direct supervisor"/"in charge"), 6 ("chain-of-command"), 7 ("supervisory authority"), 8 (the power to "send me home if he believed it necessary") and 9 ("chain-of-command") do nothing to demonstrate the existence of employer-like power in Renner. Nothing suggests that Renner played any role in the critical areas of hiring, firing and work assignments.
 
 
 41
 In sum, no reasonable factfinder could conclude that Renner was the equivalent of an "employer" as that term is understood in the Title VII context, because of the absence of proof that Renner exercised supervisory/managerial authority over Ball. Ball has thus failed to demonstrate the existence of a material factual issue, so that summary judgment was properly granted in Renner's favor as to Ball's Title VII claim. And because the issue of supervisory liability has proved dispositive, we find it unnecessary to consider the alternative grounds relied upon by the district court in support of its ruling.
 
 
 42
 Intentional Infliction of Emotional Distress
 
 
 43
 Now that Ball's federal claim has dropped out of the picture, her state law claim of intentional infliction of emotional distress is no longer supplemental to any federal question claim. Under those circumstances the most common response to a pretrial disposition of federal claims has been to dismiss the state law claim or claims without prejudice--that is the seminal teaching of United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), reconfirmed in Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988) and repeated in a host of cases such as Sawyer v. County of Creek, 908 F.2d 663, 668 (10th Cir.1990). That concept has been codified in 28 U.S.C. Sec. 1367(c)(3), part of the supplemental jurisdiction enactment in 28 U.S.C. Sec. 1367.
 
 
 44
 There are of course the best of reasons for a district court's deferral to a state court rather than retaining and disposing of state law claims itself--such factors (taught by Gibbs and repeated in Carnegie-Mellon ) as judicial economy, fairness, convenience and comity. As this Court has said in Thatcher Enters. v. Cache County Corp., 902 F.2d 1472, 1478 (10th Cir.1990):
 
 
 45
 Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary.
 
 
 46
 Here the "compelling reasons" point strongly in favor of state rather than federal court resolution of the state law claim. We note that Ball is free to pursue her claim in a Wyoming court because even if the statute of limitations would otherwise have run, Wyoming's saving statute (Wyo.Stat. Sec. 1-3-118 (1977)) affords her a year from a current federal court dismissal to commence a new action in the state court.[8] Most importantly, at the time that the district court ruled on that claim it did not have the benefit of the later-decided Supreme Court of Wyoming decision in Wilder v. Cody Country Chamber of Commerce, 868 P.2d 211, 223-24 (1994), which has taken an extended fresh look at the elements of the intentional-infliction-of-emotional-distress tort. Where a state law cause of action is thus in a process of current evolution, it is particularly appropriate for the federal courts to leave the continuing development and application of that cause of action to the state courts. Needless to say, we express no substantive views on how the claim should play out in light of Wilder. We simply reverse the summary judgment entered by the district court on the state law claim for intentional infliction of emotional distress, remanding that claim with instructions to dismiss it without prejudice.
 
 Conclusion
 
 47
 We AFFIRM the district court's grant of summary judgment in Renner's favor on Ball's Title VII claim. We REVERSE the grant of summary judgment on her state law claim, and we REMAND that claim with instructions to dismiss it without prejudice.
 
 
 
 *
 The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation
 
 
 [1]
 Further citations to Title VII's provisions will take the form "Section--," using Title 42's numbering rather than the statute's internal numbering
 
 
 [2]
 Title VII's prohibition against sex discrimination includes a ban on sexual harassment (Harris v. Forklift Sys., Inc., --- U.S. ----, ----, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986)). Sex discrimination of that type occurs either (1) where an employer's conduct creates a work environment that is hostile or abusive to women (the so-called hostile work environment theory, see Harris, --- U.S. at ----, 114 S.Ct. at 370; Meritor, 477 U.S. at 66, 106 S.Ct. at 2405) or (2) where specific benefits of employment are conditioned on sexual demands (the so-called quid pro quo theory, see Meritor, 477 U.S. at 65, 106 S.Ct. at 2404; Hicks v. Gates Rubber Co., 833 F.2d 1406, 1413-14 (10th Cir.1987)). Ball claims that Renner's behavior created a hostile work environment
 
 
 [3]
 "Directly" is used advisedly here. For example, the Seventh Circuit has upheld a Title-VII-based judgment against a responsible individual as well as the formal "employer" (Gaddy v. Abex Corp., 884 F.2d 312, 314, 318 (7th Cir.1989) and on another occasion has analyzed other Title VII issues by assuming the existence of individual liability (EEOC v. Vucitech, 842 F.2d 936, 943-44 (7th Cir.1988))). But in each instance the Court of Appeals has not expressly discussed the question with which we are dealing
 
 
 [4]
 Others have summarized the nationwide situation in a somewhat different manner (e.g., Matthews v. Rollins Hudig Hall Co., 874 F.Supp. 192, 194 (N.D.Ill.1995); Jendusa, 868 F.Supp. at 1010; Scott B. Goldberg, Comment, Discrimination by Managers and Supervisors: Recognizing Agent Liability Under Title VII, 143 U.Pa.L.Rev. 571, 573-74 nn. 15 & 16 (1994))
 
 
 [5]
 Further thought demonstrates that such a seeming contradiction in terms is hardly revolutionary. Thus the essence of most 42 U.S.C. Sec. 1983 liability involves the abuse of power by public officials--again the unauthorized exercise of authority
 
 
 [6]
 29 U.S.C. Sec. 630(b), the corresponding provision of the Age Discrimination in Employment Act, contains a definition of "employer" as including "agent" in much the same way as the Title VII statute under consideration here
 
 
 [7]
 If instead the Sauers pronouncement were to govern, Brenner would be suable only as a surrogate for Cheyenne--and as stated at the outset of this opinion, Ball has already lost her case against Cheyenne
 
 
 [8]
 That time frame controls over the 30-day tolling period that 28 U.S.C. Sec. 1367(d) provides for dismissed supplemental claims where state law does not grant a longer tolling period