Sharon H. KANZLER, formerly known as Sharon H. Ball, Appellant (Plaintiff),

v.

David RENNER, Appellee (Defendant).

No. 96–60.

Supreme Court of Wyoming.

May 23, 1997.

Jane A. Villemez, Cheyenne, for Appellant (plaintiff).

Terry L. Armitage, Cheyenne, for Appellee (defendant).

Before TAYLOR, C.J., and THOMAS, MACY, GOLDEN and LEHMAN, JJ.

LEHMAN, Justice.

Appellant Sharon Kanzler, a former dispatcher with the Cheyenne Police Department, appeals from the summary judgment which was entered in favor of appellee, police officer David Renner, on Kanzler's claim of intentional infliction of emotional distress.

We reverse.

Appellant Kanzler states two issues:

1. Whether the defense of qualified immunity shields a police officer from suit for outrageous conduct outside the scope of his duties.
2. Whether evidence of physical attack, persistent harassment and severe emotional injury requires a jury decision on a claim for intentional infliction of emotional distress.

Appellee Renner presents the issues in this way:

I. Was appellee David Renner, defendant below, entitled to summary judgment in his favor as a matter of law, concerning the cause of action for intentional infliction of emotional distress?

II. Was appellee David Renner, defendant below, entitled to summary judgment in his favor as a matter of law, based upon the affirmative defense of qualified immunity?

### FACTS

Kanzler was employed by the City of Cheyenne Police Department from July 12, 1982, through August 14, 1991, as a police dispatcher. During her employment with the Police Department, Kanzler developed a friendship with Renner, a police officer also employed by the Cheyenne Police Department. Kanzler claims that beginning in mid-March of 1991, and continuing for a period of approximately six weeks, Renner's conduct toward her changed and he engaged in behavior that was both offensive and unwelcome.

The first identified deviation in behavior occurred at approximately 4:00 a.m. one morning in mid-March when Kanzler was driving home from work. According to Kanzler, as she drove toward her home, a car approached her from behind at a high rate of speed. Kanzler stopped when she realized that she was being followed by a squad car. As the car passed her, she noticed that it was driven by Renner. When she pulled into her driveway, Renner drove around her car and squealed to a stop in front of her house. By that time, she had run to her front door and Renner called out to her, "Hey, Babe, come here." Kanzler was frightened and she responded by locking herself inside the house.

When Kanzler arrived at work the next night, she found a note from a dispatcher stating Renner had logged her speeding.

Within the next few days, Kanzler noticed Renner's squad car parked down the street from her house when she arrived home from work shortly after 4:00 a.m. When she got out of her car, Renner sped toward her. Kanzler again hurried into the house and locked the door behind her. Renner stopped for several seconds in front of her house as she peered out the window, and then sped off.

Following this incident, Kanzler claims that Renner started coming into the radio room where she worked more frequently than he had in the past. She states that he would sit close to her and stare at her for long periods of time while she was attempting to do her radio dispatch job.

Kanzler also claims that Renner asked her when they were going to go to Fort Collins so that she could teach him to two-step. Kanzler acknowledges that she and defendant Renner had gone to Fort Collins in the past, but she states that she advised Renner that they were not going to go to Fort Collins again and that she did not want to teach him to two-step. Later that night, Kanzler claims that Renner approached her, grabbed her, pulled her body up next to his, and started to slow dance. She told him to leave her alone and pushed him away.

On one occasion, Renner put his arm around Kanzler while she was talking with another officer and pulled her to him. She knocked his arm away, said "don't," and left the room. On another occasion, she walked to the back door to tell her boyfriend, Officer Greg Ball, goodnight, and Renner's squad car was parked behind her car. As she turned to go back into the building, Renner called to Kanzler that he had a question to ask her. Kanzler responded "What are you trying to do? You know I'm involved with somebody else," at which point Renner said, "Have a nice life," and sped off.

Finally, Kanzler claims that Renner attacked her in a utility closet in the dispatch room on May 1, 1991. According to Kanzler, Renner followed her into the closet and

pulled the door shut behind him. The light was not on. Renner grabbed Kanzler and pulled her to him. She pushed away from him and the door flew open. Renner "took a stance" and pulled the door shut. Kanzler states that she was very scared and angry and that she attempted to call for help on a portable radio that was inside the closet. As she reached for the radio, Renner tried to grab it away from her, and she managed to escape from the closet. Kanzler's co-worker, Sue Pexton, was approximately eight feet away from the closet. Pexton has stated that she saw Renner follow Kanzler into the closet and that she heard a click on the radio and a commotion in the closet. She does not know what actually occurred inside the closet, but she noted that Kanzler was visibly upset when she returned to her dispatch console. Kanzler asserts that later that night, Renner approached her console where she was sitting with her feet propped up, asked her what was wrong, and rubbed his crotch against her leg.

Kanzler was sufficiently upset by the events that evening that she was unable to complete her shift. She reported the incidents involving Renner to Chief Patterson and Lieutenant Powell the next morning, and it was agreed that she should take the next four days off. Kanzler returned to work her regularly scheduled shift on May 6, but she again became too emotionally distraught to finish her shift, fearful that she would come in contact with Renner. Kanzler began to see a counselor, and was diagnosed as suffering from depression and post-traumatic stress disorder as a result of the incidents at work. Kanzler used up all her sick and vacation leave, and then took leave without pay. She resigned from the police department on August 14, 1991, never having returned to work.

On February 19, 1993, Kanzler filed suit in Federal District Court against Renner and the City of Cheyenne. She asserted claims of sexual harassment against both defendants under Title VII of the Civil Rights Act of 1964 (Title VII),[1] and claims against the City alone for denial of equal protection and wrongful termination of her employment in violation of state public policy. Kanzler also asserted a claim against Renner for intentional infliction of emotional distress based on the same facts underlying her sexual harassment claim. The district court granted summary judgment in favor of Renner on both the Title VII claim and the state tort claim. *Ball v. City of Cheyenne,* 845 F.Supp. 803, 813–14 (D.Wyo.1993). Kanzler proceeded to trial against the City on her Title VII claim based on hostile environment sexual harassment. After a bench trial, the court entered judgment in favor of the City on May 18, 1994. The court concluded that Kanzler failed to establish by a preponderance of the evidence the elements of proof necessary to her claim, and that even if she had, her case against the City would fail because the City reacted promptly and appropriately to her allegations once reported.

Kanzler appealed the grant of summary judgment in favor of Renner to the Tenth Circuit Court of Appeals. *Ball v. Renner,* 54 F.3d 664 (10th Cir.1995). The court upheld the grant of summary judgment on the Title VII claim because Renner exercised no supervisory/managerial authority over Kanzler and hence could not be considered Kanzler's "employer" so as to incur liability under Title VII. *Id.* at 668. With respect to the intentional infliction of emotional distress claim, the Tenth Circuit recognized the evolving nature of the tort, the.fact that it is a state law cause of action, and that the district court did not have the benefit of the later-decided Wyoming Supreme Court case of *Wilder v. Cody Country Chamber of Commerce,* 868 P.2d 211 (Wyo.1994), when it ruled on Kanzler's claim. Consequently, the court reversed the summary judgment on the claim for intentional infliction of emotional distress, ordering dismissal of the claim "without prejudice to its reassertion before a state tribunal." *Ball,* 54 F.3d at 665.

On August 22, 1995, Kanzler filed a claim of intentional infliction of emotional distress against Renner in state district court. The district court granted Renner's motion for summary judgment on January 10, 1996, on the grounds that 1) Renner was entitled to

---

**1.** 42 U.S.C. §§ 2000e to 2000e–17.

qualified immunity, and 2) Renner's conduct was not sufficiently outrageous to present a jury question. Kanzler timely appeals the district court's order.

## STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. W.R.C.P. 56; *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211, 216 (Wyo.1994). A material fact is one which if proven would establish or refute one of the essential elements of a cause of action or defense which has been asserted. *Id.* This court evaluates the propriety of summary judgment using the same standards and materials used by the district court, affording no deference to the district court's decisions on issues of law. *Id.* We look at the record from a viewpoint most favorable to the party opposing the motion, allowing that party all reasonable inferences which may be fairly drawn from the record. *Id.* Summary judgment is inappropriate to resolve factual disputes, and our review does not entail weighing disputed evidence. *Id.*

## DISCUSSION

### A. Intentional Infliction of Emotional Distress

■ Kanzler contends that Renner's actions constituted intentional infliction of emotional distress. In Wyoming, we have adopted the *Restatement* formulation of the tort of intentional infliction of emotional distress:

§ 46. Outrageous Conduct Causing Severe Emotional Distress

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

*Leithead v. American Colloid Co.*, 721 P.2d 1059, 1065 (Wyo.1986) (*quoting* RESTATE-MENT, SECOND, TORTS § 46(1) (1965)). To recover for intentional infliction of emotional distress, a plaintiff must prove that the defendant's conduct was extreme and outrageous and that the defendant intentionally or recklessly caused the plaintiff to suffer severe emotional harm. *R.D. v. W.H.*, 875 P.2d 26, 31 (Wyo.1994) (*citing Leithead*, 721 P.2d at 1065–66). When presented with a motion for summary judgment, the court, as a matter of law, makes preliminary determinations regarding the outrageousness of the conduct and the severity of the emotional distress. The court's role is explained in the comments to the *Restatement:*

h. *Court and jury.* It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

\* \* \* \* \* \*

j. *Severe emotional distress.* \* \* \* It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed.

RESTATEMENT, *supra*, § 46 cmts. h, j.

■ Outrageous conduct is defined as conduct which goes "beyond all possible bounds of decency," and which is "regarded as atrocious, and utterly intolerable in a civilized community." RESTATEMENT, *supra*, § 46 cmt. d. In both *Leithead* and *Wilder* we recognized that certain conduct in the employment context may rise to the level of outrageousness necessary to provide a basis of recovery for the tort of intentional infliction of emotional distress. *Leithead*, 721 P.2d at 1066; *Wilder*, 868 P.2d at 223–24. Our first task is to determine whether the pattern of behavior alleged, when it occurs in the workplace, satisfies the outrageousness element of the tort.

■ We are in accord with numerous jurisdictions which have determined that inappropriate sexual conduct in the workplace can, upon sufficient evidence, give rise to a claim of intentional infliction of emotional

distress.[2] In reaching this decision, we find persuasive this pronouncement from the Utah Supreme Court:

> It is worth stating forcefully that any other conclusion would amount to an intolerable refusal to recognize that our society has ceased seeing sexual harassment in the work place as a playful inevitability that should be taken in good spirits and has awakened to the fact that sexual harassment has a corrosive effect on those who engage in it as well as those who are subjected to it and that such harassment has far more to do with the abusive exercise of one person's power over another than it does with sex. See, e.g., Louise F. Fitzgerald, Science v. Myth: The Failure of Reason in the Clarence Thomas Hearings, 65 S.Cal.L.Rev. 1399, 1399 (1992); Carol Sanger, The Reasonable Woman and the Ordinary Man, 65 S.Cal.L.Rev. 1411, 1415 (1992).

Retherford v. AT & T Communications of Mountain States, Inc., 844 P.2d 949, 978 (Utah 1992).[3]

Recent decisions reveal widely varying and inconsistent attitudes regarding the severity of sexual misconduct required for a showing of outrageousness. See, e.g., Fisher v. San Pedro Peninsula Hosp., 214 Cal.App.3d 590, 262 Cal.Rptr. 842, 858 (1989) (sexual harassment in the workplace is by its very nature outrageous conduct as it exceeds all bounds of decency usually tolerated by a decent soci-ety); DeShiro v. Branch, No. 96–800–CIV–T–17E, 1996 WL 663974 at *26 (M.D.Fla. Nov.4, 1996) (factors that command the attention of the courts on this issue are the presence of both physical and verbal abuse and the pervasiveness of the harassment); Bryant v. Better Business Bureau of Greater Md., Inc., 923 F.Supp. 720, 748 (D.Md.1996) (abuse of a position of authority may lend itself to a determination that conduct is outrageous); Phillips v. J.P. Stevens & Co., Inc., No. 3:92CV00094, 1995 WL 794200 at *12 (M.D.N.C. May 1, 1995) (only serious and pervasive harassment is sufficient to support a claim); Lang v. Seiko Instruments USA, Inc., No. CIV. A. 96–5398, 1997 WL 11301 at *4 (E.D.Pa. Jan.14, 1997) (claim for outrageous conduct in the employment context requires sexual harassment plus some sort of retaliation). This disparity is due in large part to the vague, subjective, and value-laden concept of "outrageousness," and the highly fact-specific inquiry required of the courts. See Daniel Givelber, The Right to Minimum Social Decency and the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct, 82 COLUM. L.REV. 41, 51 (1982); Krista J. Schoenheider, Comment, A Theory of Tort Liability for Sexual Harassment in the Workplace, 134 U. PA. L.REV. 1461, 1483 (1986); Mae C. Quinn, Note, The Garden Path of Boyles v. Kerr and Twyman v. Twyman: An Outrageous Response to Victims of Sexual Misconduct, 4

---

**2.** See, e.g., Fisher v. San Pedro Peninsula Hosp., 214 Cal.App.3d 590, 262 Cal.Rptr. 842, 858 (1989); Howard Univ. v. Best, 484 A.2d 958, 985–86 (D.C.App.1984); DeShiro v. Branch, No. 96–800–CIV–T–17E, 1996 WL 663974 at *3 (M.D.Fla. Nov.4, 1996); Howard v. Town of Jonesville, 935 F.Supp. 855, 861–62 (W.D.La. 1996); Bryant v. Better Business Bureau of Greater Md.; Inc., 923 F.Supp. 720, 747–48 (D.Md. 1996); Collins v. Willcox Inc., 158 Misc.2d 54, 600 N.Y.S.2d 884, 885–86 (Sup.Ct.1992); Hogan v. Forsyth Country Club Co., 79 N.C.App. 483, 340 S.E.2d 116, 121 (1986); Valerio v. Dahlberg, 716 F.Supp. 1031, 1040 (S.D.Ohio 1988); Lazarz v. Brush Wellman, Inc., 857 F.Supp. 417, 423 (E.D.Pa.1994); Bennett v. CompUSA, Inc., No. 3:96–CV–0742–P, 1997 WL 10028 at *10 (N.D.Tex. Jan.7, 1997); Retherford v. AT & T Communications of Mountain States, Inc., 844 P.2d 949, 978 (Utah 1992).

**3.** The term "sexual harassment" is susceptible of many definitions, and potentially encompasses a broad range of conduct. We use the term not to refer to Title VII sexual harassment, but in a more general sense, as did the Retherford court. See 844 P.2d at 977–78. Conduct generally labeled sexual harassment can range from an "accidental" brushing against a woman's body or an unwanted touching or kissing to a physical assault such as rape. Sexual harassment also assumes verbal forms, such as suggestive remarks or derogatory comments or direct demands for sex. Krista J. Schoenheider, Comment, A Theory of Tort Liability for Sexual Harassment in the Workplace, 134 U. PA. L.REV. 1461, 1461–62 (1986). Such conduct may or may not be actionable under Title VII. For example, Title VII is limited in application to employers, and to establish hostile work environment sexual harassment a plaintiff must show a pattern of harassment motivated by plaintiff's membership in a protected group. 42 U.S.C. § 2000e–2(a)(1); Ball v. City of Cheyenne, 845 F.Supp. 803, 808–09 (D.Wyo.1993).

Tex. J. Women & L. 247, 253 (1995). Nevertheless, we are able to discern several recurring factors that courts have used to assist in the determination of whether particular conduct in the workplace is sufficiently outrageous to survive a preliminary motion.

1. **Abuse of power.** Restatement, Second, Torts, *supra,* § 46 cmt. e ("extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests."); *Bryant v. Better Business Bureau of Greater Md., Inc.,* 923 F.Supp. 720, 747 (D.Md.1996); *Crump v. P & C Food Markets, Inc.,* 154 Vt. 284, 576 A.2d 441, 448 (Vt.1990).

2. **Repeated incidents/pattern of harassment.** *Boyle v. Wenk,* 378 Mass. 592, 392 N.E.2d 1053, 1056 (Mass.1979) ("Repeated harassment * * * may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability"); *Howard v. Town of Jonesville,* 935 F.Supp. 855, 861–62 (W.D.La.1996); *Howard Univ. v. Best,* 484 A.2d 958, 986 (D.C.App.1984).

3. **Unwelcome touching/offensive, non-negligible physical contact.** *Bryant v. Better Business Bureau of Greater Md., Inc.,* 923 F.Supp. 720, 747 (D.Md. 1996) ("there is something fundamentally different about conduct which involves * * * touching areas of the female anatomy which are generally considered off-limits to anyone other than a consensual sexual partner or a physician"); *Hogan v. Forsyth Country Club Co.,* 79 N.C.App. 483, 340 S.E.2d 116, 120 (N.C.App.1986).

4. **Retaliation for refusing or reporting sexually-motivated advances.** *Shaffer v. National Can Corp.,* 565 F.Supp. 909, 916 (E.D.Pa.1983) (situation where the future success of a person's employment depends on the performance of sexual favors goes far beyond the ambit of insults or demeaning remarks); *Retherford v. AT & T Communications,* 844 P.2d 949, 978 (Utah 1992).

■ Viewing the evidence in the light most favorable to Kanzler, we find that at least two of the factors set out above are present. First, she alleges repeated incidents over a period of several weeks in which Renner stared at her, followed her, and subjected her to sexually-motivated advances and physically intimidating behavior, each escalating in intensity and severity. Second, she alleges unwelcome, non-negligible physical contact wherein Renner touched and hugged her even after she repeatedly rebuffed his advances, and ultimately confined her in a closet and rubbed his crotch against her leg. Kanzler has alleged conditions and circumstances which are beyond mere insults, indignities and petty oppressions and which, if proved, could be construed as outrageous. At the very least, reasonable persons could differ in their conclusions as to whether Renner's conduct was extreme and outrageous. Consequently, it is for a jury to determine whether Renner's conduct was sufficiently outrageous to result in liability.

■ We next turn to the second element of the tort, whether Kanzler has suffered severe emotional distress. Emotional distress includes "all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." Restatement, *supra,* § 46 cmt. j. The *Restatement* requires that the emotional distress be "so severe that no reasonable man could be expected to endure it." *Id.*

Kanzler testified that she was frightened and anxious after the closet incident. She presented evidence that shortly after that time, she consulted Carolyn Bartlett, a licensed clinical social worker, who diagnosed and began treating Kanzler for post-traumatic stress disorder. At the same time, Kanzler's family practitioner, Michael Herber, M.D., diagnosed and began treating her for anxiety and depression due to the incidents at work. The City of Cheyenne requested an independent evaluation from Leonard Medoff, Ph.D., a forensic psychologist, who confirmed that the closet incident triggered a post-traumatic stress disorder. Kanzler tes-

tified that she continues to have problems. The evidence presented by Kanzler, consisting of her own testimony and including the diagnoses and opinions of three experts, is sufficient to create a jury issue on the severity of her emotional distress.

We hold that Kanzler has presented sufficient evidence to support her claim that Renner intentionally or recklessly subjected her to outrageous conduct which caused her severe emotional harm. Additionally, we find this case presents genuine issues of material fact about whether Renner acted in the way Kanzler alleges. Such questions, which revolve around the credibility of the parties, are properly resolved by the trier of fact, not the court. Therefore, summary judgment is reversed.

## B. Qualified Immunity

■ Kanzler contends that the district court erred in granting summary judgment in favor of Renner on the basis of qualified immunity. Under the common law, police officers have never been granted absolute immunity for their actions. *Blake v. Rupe,* 651 P.2d 1096, 1107 (Wyo.1982), *cert. denied* 459 U.S. 1208, 103 S.Ct. 1199, 75 L.Ed.2d 442 (1983) *(citing Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967)). Rather, police officers enjoy only a limited immunity from tort liability. *DeWald v. State,* 719 P.2d 643, 647 (Wyo.1986).

■ The standard of qualified immunity established under our common law is distinct from the federal standard.[4] In *Darrar v. Bourke,* we reviewed the factors which would entitle a peace officer to qualified immunity from a tort suit brought pursuant to

state law: 1) the officer was acting within the scope of his or her duties; 2) the officer was acting in good faith; 3) the officer's acts were reasonable under the circumstances; and 4) the officer's acts were discretionary duties and not merely operational or ministerial duties. 910 P.2d 572, 575–76 (Wyo.1996). "It is one thing to say qualified immunity is *available* to peace officers * * * it is quite another to determine whether officers in a particular case are *entitled* to qualified immunity." *Darrar,* at 577. Renner is entitled to summary judgment on the basis of qualified immunity only if he establishes that while acting within the scope of his duties, he performed his discretionary duties reasonably and in good faith.

■ The preliminary inquiry is whether Renner was acting within the scope of his duties. When an official acts outside the scope of his authority, he acts individually and not in his official capacity and, therefore, he cannot claim the protection of qualified immunity. *Oyler v. State,* 618 P.2d 1042, 1047 (Wyo.1980). The fact that an official was at work or on duty does not in itself establish that he was acting within his authority. *See Jung–Leonczynska v. Steup,* 782 P.2d 578, 582 (Wyo.1989).

■ In his summary judgment materials, Renner bases his entitlement to qualified immunity on the federal standard, stating that he acted in good faith at all times and violated no clearly established law. However, Renner fails to recognize that whether a public officer acted within his or her authority is a threshold inquiry under either the common law qualified immunity test or the

---

4. Renner argues that we should apply the qualified immunity test established in *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982): "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." The *Harlow* test eliminates the subjective, "good faith" requirement. *Harlow* applies where the plaintiff has alleged a violation of federal statutory or constitutional rights. *See, e.g., Lucero v. Mathews,* 901 P.2d 1115, 1118 (Wyo.1995) (al-

leged violation of Fourteenth Amendment due process and First Amendment); *Abell v. Dewey,* 870 P.2d 363, 367 (Wyo.1994) (alleged violation of 42 U.S.C. § 1983). However, when analyzing qualified immunity for state common law tort claims, as compared with claims alleging a violation of "statutory or constitutional rights," we have consistently applied the factors enumerated in *Darrar v. Bourke. See, e.g., Darrar,* 910 P.2d 572, 575–77 (Wyo.1996) (negligence action); *Blake v. Rupe,* 651 P.2d 1096, 1109 (Wyo.1982) (various negligence and intentional tort claims); *Oyler v. State,* 618 P.2d 1042, 1053 (Wyo.1980) (negligence action).

federal *Harlow* test.[5] Renner presents no evidence in his summary judgment materials to establish that he was acting within his authority. Certainly, the sexual misconduct alleged by Kanzler and taken as true for summary judgment purposes cannot be within the scope of any public officer's duties and is not the type of conduct that is shielded from liability under the doctrine of qualified immunity. On the record before us, we find no basis for the district court's determination that Renner was entitled to qualified immunity; as a result, we reverse. *Darrar*, 910 P.2d at 577.

### CONCLUSION

We hold that, as a matter of law, Kanzler presented sufficient evidence in support of her claim of intentional infliction of emotional distress, based on inappropriate sexual conduct by a co-employee in the workplace, to survive Renner's motion for summary judgment. Further, we hold that Renner has not shown he is entitled to qualified immunity. Finally, this case presents genuine issues of material fact about whether Renner acted in the way Kanzler alleges. These questions are not appropriately resolved by a summary judgment. Therefore, the district court's order is reversed and the case is remanded for further proceedings consistent with this opinion.

THOMAS, Justice, concurring specially.

I am in accord with the result of this case, because it appears to me that in addition to the sexual misconduct emphasized in the majority opinion, Renner essentially was stalking Kanzler. I have a concern, however, that our law in this area is not developing in a particularly cohesive manner, noting that two members of the Court dissented in *Garcia v. Lawson*, 928 P.2d 1164 (Wyo.1996). This is such a potentially volatile tort that I think it is essential that we carefully craft its parameters.

All the trial bench can discern at this point is that if the ground for claiming intentional infliction of emotional distress is sexual misconduct, a decision to grant a summary judg-

ment is full of risk. Yet, it would not be a good thing for the trial bench to abandon its role as a gatekeeper. Our adoption of the Restatement Second rule surely includes this comment:

> h. *Court and jury.* It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

RESTATEMENT (SECOND) OF TORTS § 46 cmt. h (1965).

It is my hope that the trial bench and the bar in Wyoming will not read into this decision an arbitrary rule that in every case involving sexual misconduct reasonable men can differ as to whether the conduct is so extreme and outrageous as to justify recovery. I do not believe the Court so intends, but if I am mistaken, such a rule would be erroneous in my view.

---

5. The issue in *Harlow* was the scope of immunity available to public officials in a suit for damages based on their official acts. *Harlow*, 457 U.S. at 802, 102 S.Ct. at 2729–30 (emphasis added).