**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 9 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

THOMAS N. NELSON,

      Plaintiff-Appellant,

v.

WILLIAMS FIELD SERVICES
COMPANY,

      Defendant-Appellee.

No. 99-8041
(D.C. No. 98-CV-242-D)
(District of Wyoming)

**ORDER AND JUDGMENT**[*]

Before **BRORBY**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and
**ELLISON**,[**] Senior District Judge.

On September 8, 1998, Thomas N. Nelson ("Nelson"), a citizen of Wyoming, filed

an action in the District Court of the Third Judicial District in and for the County of

Lincoln, State of Wyoming, against Williams Field Services Company ("Williams"), a

Utah corporation doing business in Wyoming as a natural gas processor. In his complaint

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

[**]Honorable James O. Ellison, Senior District Judge, United States District Court
for the Northern District of Oklahoma, sitting by designation.

Nelson alleged that he was employed by Williams on April 15, 1992 and thereafter remained an employee of Williams until his termination on February 25, 1997. At the time of his termination Nelson stated he was employed as a Gathering Technician II. Nelson asserted four claims for relief: (1) a violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101; (2) breach of covenant of good faith and fair dealing; (3) wrongful termination of an implied contract; and (4) intentional infliction of emotional distress.

On September 28, 1998, Williams filed in the United States District Court for the District of Wyoming a Notice of Removal pursuant to 28 U.S.C. §§ 1332, 1441(a) and 1446, alleging that there was a diversity of citizenship and that the amount in controversy exceeded $75,000.00, and further alleging that one of Nelson's four claims was based on the ADA, thus presenting a federal question. In the federal district court in Wyoming Williams later filed its answer to the complaint, which contained ten affirmative defenses. Discovery ensued. On February 16, 1999, Williams filed a motion for summary judgment on all of Nelson's four claims. On February 26, 1999, Nelson filed a motion for partial summary judgment on his claims based on ADA and breach of implied contract. On April 8, 1999, after briefing and oral argument, the district court, in a telephone conversation with counsel, granted Williams' motion for summary judgment on all four claims, and denied Nelson's motion for partial summary judgment on his ADA claim and his claim for breach of implied contract. By written order and judgment the district court

on April 13, 1999 entered judgment in favor of Williams and against Nelson, dismissing Nelson's claims with prejudice, each party to bear their own costs. Nelson appeals. We affirm.

As indicated, Nelson was initially employed by Williams on April 16, 1992 (he became a full-time employee on June 16, 1993) and remained employed with Williams until he was terminated on February 25, 1997. Nelson was hired as a field operator or gathering technician in the Big Piney area. In that position he worked in the oil field assuring that gas wells and equipment were properly maintained and that the gas was being properly measured, gathered and transported. His position apparently required considerable driving of a company vehicle from one job site to another, driving a company-owned three-quarter ton truck about four hours each day. Also, his duties involved working around and repairing potentially explosive materials. Nelson performed his duties satisfactorily and received regular promotions until his termination.

However, Nelson did have his problems. At one point in time, we are not certain exactly when, Nelson advised his supervisor, Charles Maffei ("Maffei") and Williams' human resource supervisor, Louis DiBella ("DiBella"), that in 1988 he had been diagnosed as having multiple sclerosis. Maffei assured Nelson that Williams would accommodate that affliction and that he would not be transferred to any position where his multiple sclerosis would affect his ability to perform his job. And Nelson, in his deposition, testified that the multiple sclerosis did not affect his ability to perform his job

- 3 -

assignment at Williams.

Williams maintained a drug and alcohol policy which encouraged employees who had or thought they had an alcohol or drug dependency problem to step forward and seek help. In early September, 1994 Nelson apparently had a near-suicide incident. The next workday Nelson went to his supervisor, Maffei, and said that he "needed to talk." Nelson in his deposition said that he "trusted" Maffei. On that occasion Nelson told Maffei that he needed help because of personal problems and excessive consumption of alcohol on weekends, and Maffei, in turn, assured Nelson that he would do "anything" to help and that Williams would give him help. Maffei suggested that Nelson contact the human resources department maintained by Williams and talk with DiBella, which he did. As a result of that conversation, DiBella arranged for Nelson to check into Olympus View Hospital in Salt Lake City, Utah, which Nelson did on September 13, 1994. In connection therewith DiBella advised Nelson that he would be given time off for his treatment, that he would need a fitness-for-duty release, and that he would be required to sign a "Return-to-Work" Agreement before returning to work. Nelson remained at the hospital through September 19, 1994 for treatment of a depressive disorder and alcohol dependency. Upon his release, Nelson was referred to an after-care program and prescribed to take 20 milligrams of Prozac daily.

After his discharge from Olympus View Hospital but before returning to work, Nelson was required by Williams to sign a release which allowed certain medical reports

made by attending physicians at Olympus View Hospital to be released to Williams. Further, before being allowed to return to work, Williams required Nelson to sign a "Return-to-Work Agreement" which, *inter alia,* required Nelson "for the duration of his employment with employer, to refrain from consuming alcohol or unauthorized drugs." It further required unannounced periodic alcohol testing for five years as a condition of continued employment. The agreement also provided that any violation of its conditions would result in termination. Nelson signed that agreement on September 23, 1994 and returned to work with Williams.

For the rest of 1994, and for all of 1995 and 1996 there was no indication that Nelson violated any provision of his Return-to-Work Agreement. However, on January 5, 1997, Nelson was arrested when driving his personal vehicle on his own time while under the influence of alcohol. At the time of his arrest Nelson informed the arresting officer that he would lose his job because of the incident. On January 15, 1997, Nelson received a satisfactory performance rating. Two weeks later, on or about January 31, 1997, Nelson informed Maffei of his arrest for drunk driving on January 5. In this connection, Nelson told Maffei that his high blood alcohol level could have been caused by the medicine he was taking for multiple sclerosis. Nelson later pled guilty to drunk driving.

On February 18, 1997, Maffei wrote DiBella requesting leniency for Nelson. However, the management of Williams concluded that consistent with its policies and

safety concerns Nelson should be terminated. In this regard Maffei testified in his deposition that Nelson was terminated because he had "broken the Employee Return-to-Work Agreement," and "that the company was not willing to take the liability for the other person's life."[1] At a meeting held on February 25, 1997 to inform Nelson that he was being terminated, Nelson failed to appear. When Maffei was leaving the meeting to return to his place of work, Nelson drove up behind him on the highway. Maffei and Nelson both pulled off to the side of the road, and Nelson got in Maffei's truck. The two had a conversation at that time wherein Maffei told Nelson he had been terminated. Maffei testified that at that time Nelson "had a very, very strong smell of alcohol." DiBella testified in his deposition that in a telephone conversation he had with Nelson later on the same day, Nelson's speech was slurred. After his termination, Nelson wrote a letter to Williams stating that he thought his termination was "premature" and sought "reconsideration." Williams later reaffirmed its decision to terminate Nelson because of his violation of the Return-to-Work Agreement.

In his telephone conversation with counsel wherein the district judge advised

---

[1]More specifically, in his deposition Maffei spoke as follows:
> Because the company was not willing to take the chance of an alcoholic driving a company truck and us not finding out about it until he killed somebody, and then it's too late. I don't ride with this man everyday. And he's demonstrated that he's an alcoholic, and he's broken the Employee Return-to-Work Agreement, and the company was not willing to take the liability for the other person's life. That's why he was terminated.

counsel of his ruling on the cross-motions for summary judgment, the district judge made a detailed explanation of his decision to grant Williams' motion and deny Nelson's cross-motion. As concerns Nelson's ADA claim, the district judge concluded that Nelson had failed to make a sufficient showing that he was in fact "disabled" within the meaning of the ADA, or that the reason given by Williams for terminating Nelson, namely, his violation of the Return-to-Work Agreement, was pretextual. In thus concluding the district judge noted that Nelson was terminated because he violated the "Return-to-Work Agreement" by consuming alcohol, and that he had not been discharged simply because he was an alcoholic and had consumed alcohol while off the job. More specifically the judge held that Nelson had not made a sufficient showing that he had a physical or mental impairment which substantially limited one or more "major life activity." In so doing, the district judge noted that Nelson himself agreed that he had no difficulty in performing all his duties as a gathering technician for Williams.

As concerns Nelson's claim that Williams had breached its covenant of good faith and fair dealing, the district court concluded that Nelson had failed to show that there was a "special relationship" between himself and Williams which had been breached, citing *Garcia v. Uniwyo Fed. Credit Union,* 920 P.2d 642 (Wyo. 1996). As to Nelson's claim that Williams in terminating him had breached an implied contract of employment because it did not have "good cause" to terminate him, the district court held that Williams did have "good cause," i.e., Nelson's violation of the "Return-to-Work

Agreement." Concerning Nelson's claim of intentional infliction of emotional distress, the district court concluded that there was no showing that Williams' conduct was "extreme or outrageous," nor that Nelson had suffered "severe emotional harm," citing *Kanzler v. Renner,* 937 P.2d 1337, 1341 (Wyo. 1997).

42 U.S.C. § 12112(a) provides as follows:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12102(2) provides as follows:

> The term "disability" means, with respect to an individual–
>     (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>     (B) a record of such an impairment; or
>     (C) being regarded as having such an impairment.

To prevail on a claim of discriminatory discharge under the ADA, Nelson had to establish that he was a disabled person within the meaning of the ADA, that he was qualified and still able to perform the essential functions of a job he holds or desires, and that Williams terminated him because of his disability. *Smith v. Midland Brake Inc.,* 180 F.3d 1154, 1161(10th Cir. 1999); *Sutton v. United Air Lines, Inc.,* 130 F.3d 893, 897 (10th Cir. 1997), aff'd, 527 U.S. 471 (1999).

As indicated, the district court concluded that Nelson had failed to show that he

was in fact "disabled" within the meaning of the ADA. In our view the record supports the district court's resolution of that issue. Counsel for Nelson concedes that alcoholism is not a *per se* disability under the ADA, and that the question of disability, or no disability, based on alcoholism, must be made on a case-by-case basis. In accord, *see Burch v. Coca-Cola Co.,* 119 F.3d 305, 315-16 (5th Cir. 1997)(alcoholism is not *per se* disability under ADA).[2] Specifically, the district court held that Nelson had failed to show that his drinking problem constituted an impairment which substantially limited one or more of his major life activities. In so doing, the district court noted that Nelson's "conditions never compromised his ability to perform his job."[3] Further, the district court rejected Nelson's assertion he had a "record of substantially limiting impairments" or that Williams "regarded" Nelson as being disabled under the ADA.[4]

Alternatively, the district court observed that even if Nelson had shown, *prima facie,* that he was disabled within the meaning of the ADA, he had failed to show that

---

[2]In *Renaud v. Wyoming Dep't of Family Serv.,* 203 F.3d 723, 729-30 (10th Cir. 2000) we held that the district court did not commit reversible error in refusing to instruct a jury that "in all cases for the purposes of [the] ADA alcoholism is a disability."

[3]Like the district court, we do not believe that the affidavit of Dr. Ash created a genuine issue of material fact on the question of whether there was a substantial limitation on a major life activity. In this regard *see Burch* at 315.

[4]In *Nielsen v. Moroni Feed Co.,* 162 F.3d 604, 608 (10th Cir. 1998) we said:
Thus, in passing the ADA, Congress intended to protect individuals from employment discrimination by employers on the basis of an actual or perceived disability, provided that the disability substantially limits or is perceived to limit substantially a major life activity.

Williams' stated reason for terminating him, namely his violation of the Return-to-Work Agreement, was pretextual. In so doing, the district court correctly noted that Nelson was terminated because he violated the Return-to-Work Agreement, which Williams had the right to do under the terms of the agreement which Nelson had signed in order to be returned to work. We agree there is nothing to indicate that such was a "pretext" for disability discrimination. *See Mararri v. WCI Steel, Inc.,* 130 F.3d 1180, 1182-83 (6th Cir. 1997) (terminating an employee for failing a urine test, administered pursuant to a so-called "last chance agreement" giving the employer the right to immediately discharge an employee if he failed such test, did not violate ADA). To the same effect, *see McKey v. Occidental Chem. Corp.,* 956 F. Supp. 1313, 1319 (S.D.Tex. 1997).[5] In sum, the district court did not err in holding that Nelson had failed to make a sufficient showing that he was entitled to relief under the provisions of the ADA.

In addition to his ADA claim, Nelson asserted three claims based on Wyoming law: breach of the covenant of good faith and fair dealing, breach of an implied contract that he would only be terminated for just cause, and intentional infliction of emotional

[5]In *McKey*, that court spoke as follows:
> The violation of plaintiff's Return-to-Work Agreement constitutes misconduct sufficient to terminate his employment, even if that misconduct was related to his alcoholism. The plaintiff voluntarily entered into the Return-to-Work Agreement, fully understanding its terms and conditions. The court must strictly construe such agreements. Thus, while the provisions of the Return-to-Work Agreement may seem severe, the court's role is not to reinterpret them. Therefore, the plaintiff must abide by the consequences of his agreement.

distress.  All are based on Wyoming law and we are not inclined to disturb the district court's understanding of Wyoming law.  *Colonial Park Country Club v. Joan of Arc,* 746 F.2d 1425, 1429 (10th Cir. 1984).  As above indicated, the district court held that even though Nelson may have "trusted" Maffei, his supervisor, there was no "special employment relationship" between Nelson and Williams.  As concerns Nelson's claim for breach of implied contract, the district court concluded that, in line with its earlier ruling, Nelson was in fact terminated for cause, i.e., violation of the Return-to-Work Agreement.  Finally, the district court concluded that Nelson had made no showing that Williams' conduct was "extreme or outrageous," nor that he experienced "severe emotional" harm as a result thereof.

Judgment affirmed.

Entered for the court.

Robert H. McWilliams
Senior Circuit Judge