F I L E D
United States Court of Appeals
Tenth Circuit

AUG 2 2000

PATRICK FISHER
Clerk

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

E. STORMY APGAR,

      Plaintiff-Appellant,

v.

STATE OF WYOMING; WYOMING
DEPARTMENT OF TRANSPORTATION
HIGHWAY PATROL; EVERETTE L.
AYERS; GARY L. MARSDEN; DAVID E.
FERGUSON; DAVID D. COLEMAN;
JAMES A. PUDGE; RICHARD
BURRIDGE; CARL E. CLEMENTS;
CASEY C. GOODMAN, as individuals,

      Defendants-Appellees.

No. 99-8029
(D. Wyo.)
(D.Ct. No. 98-CV-068-D)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **BRORBY**, **McWILLIAMS**, Circuit Judges, and **ELLISON**,[**] District
Judge.

_____

    [*] This order and judgment is not binding precedent except under the doctrines of
law of the case, _res judicata_ and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

    [**] The Honorable James O. Ellison, Senior District Judge for the Northern District
of Oklahoma, sitting by designation.

Former highway patrol officer E. Stormy Apgar sued the Wyoming Highway Patrol and several officers in their individual capacities, claiming gender discrimination, hostile work environment, retaliation for reporting discriminatory conduct, breach of an implied employment contract, and intentional infliction of emotional distress. The district court granted defendants' summary judgment motion and dismissed all claims. This timely appeal followed. We exercise jurisdiction pursuant to 28 U.S.C. § 1291. After a thorough review of the briefs and record on appeal, we affirm in part, reverse in part and remand for further consideration.

## I. BACKGROUND[1]

Ms. Apgar first worked for the Wyoming Highway Patrol (Patrol) in the 1980s, resigning May 13, 1990 to pursue employment opportunities in Montana. At the conclusion of this first employment period, Ms. Apgar's supervisor gave her a mostly positive performance review and recommended she receive a favorable rating should she ever wish to return to the Patrol. Ms. Apgar did express an interest in returning to the Patrol, which led to her second period of

---

[1] Given the procedural posture of this case, we will view the facts in the light most favorable to Ms. Apgar, the nonmoving party at the summary judgment stage. *See Wolf v. Prudential Ins. Co.*, 50 F.3d 793, 796 (10th Cir. 1995).

employment beginning in January 1994. The Patrol assigned Ms. Apgar to Division C (*id.* at 288), where her supervisors included three of the named defendants in this suit: Sergeant James A. Pudge, Lieutenant David D. Coleman, and Captain David E. Ferguson Ms. Apgar was the first female patrolman to serve in Division C.

Ms. Apgar described herself as "thrilled" and happy to be back with the Patrol and stationed with Division C. Unfortunately, some of her co-workers did not share her enthusiasm for her new posting. Almost immediately Ms. Apgar began experiencing hostile behavior that would later form the basis of her complaint in this lawsuit. We now examine this allegedly discriminatory conduct.

Lieutenant Coleman told Ms. Apgar on her first day some people were not happy with her assignment to the division. Ms. Apgar quickly learned one of the patrolmen who was unhappy with her arrival was Carl Clements. Patrolman Clements was assigned to oversee Ms. Apgar's field training in Division C. Ms. Apgar felt Patrolman Clements was unsupportive from the beginning and hoped she would fail. After filing the current lawsuit, Ms. Apgar learned Patrolman Clements once told other officers at a training meeting women did not belong in law enforcement. Prior to Ms. Apgar's arrival at Division C, Patrolman Clements

also wondered aloud what she had done to receive the assignment.

During field training, Patrolman Clements apparently made two rude comments. When a citizen asked Patrolman Clements who was in his patrol car, he described Ms. Apgar as a drunk female he arrested. He also told a resident of Sheridan, Wyoming, who asked about Ms. Apgar, not to worry about having to deal with her because she would be based in the neighboring city of Buffalo. Patrolman Clements was originally assigned as Ms. Apgar's shift partner; however, Lieutenant Coleman and Sergeant Pudge eventually gave that assignment to Patrolman Joe Arzy instead, explaining to Patrolman Arzy some of the other patrolmen in the division did not want to work with Ms. Apgar.

The working relationship between Ms. Apgar and Patrolman Clements did not improve after the training period. Ms. Apgar felt Patrolman Clements was openly hostile toward her on the firing range, refusing to answer her questions and berating her for being late in front of other officers – an approach she claims he did not take with others in the division. In addition, Ms. Apgar and Patrolman Clements became embroiled in a controversy over how officers of the highway patrol should be identified in official publications. Patrolman Clements pushed the Wyoming Highway Patrol Association to adopt a policy of using the official

ranks of officers, which in the case of the rank and file officers would be "Patrolman." Ms. Apgar wrote a letter to the Association opposed to the policy and successfully lobbied to allow officers to use the unofficial title "Trooper" if so desired.

Ms. Apgar also had problems with other officers in the division. Shortly after Ms. Apgar arrived at Division C, Patrolman Casey C. Goodman refused to take tickets written by Ms. Apgar to court as was the usual practice because Ms. Apgar put a "smiley face" at the bottom of a note attached to the tickets. Patrolman Arzy recalls having to take the tickets to court himself and Patrolman Goodman later directing him to tell Ms. Apgar "real patrolmen don't put 'smiley faces' on things." Ms. Apgar responded with a sarcastic letter addressed to Patrolman Clements, whom she believed had made the comment.

To make matters worse, Ms. Apgar's interactions with Sergeant Pudge were terse and unfriendly. Ms. Apgar sensed Sergeant Pudge was uncomfortable around her, a hunch Sergeant Pudge confirmed in his deposition. Sergeant Pudge felt uncomfortable because in his opinion Ms. Apgar did not take criticism or suggestions well, a trait he told Lieutenant Coleman reminded him of his ex-wife. In addition, Sergeant Pudge did not ride with Ms. Apgar as often as he should

have and provided her first performance review in a public place with another patrolman present. Other co-workers gave Ms. Apgar an equally cool reception. For instance, Ms. Apgar claims other officers would pass her on the street or highway and refuse to acknowledge her either by gesture or verbally over the radio. She also claims she was regularly excluded from "coffee meetings" with other officers.

Ms. Apgar did develop a good relationship with her shift partner, Patrolman Arzy, but unfortunately the strength of their professional relationship led to unfounded rumors within the local law enforcement community the two were involved in an amorous affair, and inappropriate comments from a Department of Transportation mechanic making the same inference. Eventually Lieutenant Coleman and Sergeant Pudge became aware of the rumors, and in order to put an end to the gossip, decided to split up the shift partners by reassigning Patrolman Arzy to a different shift.

Ms. Apgar viewed Patrolman Arzy's shift change as the last straw, and as a result sent a letter, running over nine single-spaced pages, to the head of the Patrol, Colonel Everette Ayers. In the letter, Ms. Apgar detailed the behavior she found objectionable, claimed she was being discriminated against based on her

gender, and asked Colonel Ayers to rectify the situation. Colonel Ayers assigned Major Gary Marsden to investigate Ms. Apgar's complaint, a task Major Marsden completed by delivering a written report to Colonel Ayers in March 1995, less than two months after Ms. Apgar wrote her letter to Colonel Ayers.

Major Marsden's investigation confirmed the occurrence of several of the events listed above, found a general feeling of "uneasiness and apprehension" between Ms. Apgar and some of her co-workers, and discovered a problem with Sergeant Pudge's supervisory techniques. Major Marsden concluded Sergeant Pudge's shortcomings were directed at all members of the division, not solely toward Ms. Apgar, and many of the problems could be traced to a lack of communication within the division. The written report concluded by stating Ms. Apgar's complaints were raised with her supervisors, positive changes were made in the supervisory approach, and all parties agreed some professional courtesy could provide a remedy and improve the workplace atmosphere. In addition to the operational changes made in the division, Patrolman Arzy was restored to his previous shift and again became Ms. Apgar's shift partner.

Unfortunately, the return of her shift partner was the only positive development to come out of Ms. Apgar's grievance letter. Her supervisors and

co-workers were not pleased with the accusations in her letter or in the way it was presented outside the normal chain of command. For instance, Captain Ferguson traveled to Buffalo to meet with Ms. Apgar and express his disappointment she had not raised her concerns with him personally prior to notifying the Colonel. Lieutenant Coleman agreed he felt "betrayed" and "miffed" that Ms. Apgar had "gone over [his] head," and described his relationship with Ms. Apgar as "frostier" after the letter was sent.. Sergeant Pudge described the letter as disruptive. Captain Ferguson did meet with Patrolmen Clements, Goodman, and Burridge to extract assurances they would make an effort to develop a better working relationship with Ms. Apgar, and several meetings were scheduled between Ms. Apgar and her co-workers to accomplish this goal. However, Ms. Apgar decided to stop attending the meetings, and her situation with her co-workers did not improve.

In Ms. Apgar's view, the tension within Division C culminated in Sergeant Pudge's failure to provide her adequate backup while she searched for two escapees from the Wyoming Boys' School. Ms. Apgar first learned of the escape the early morning of July, 24, 1995, and she located and arrested the escapees at approximately 3:00 p.m. that same afternoon. Ms. Apgar and Patrolman Arzy apparently asked Sergeant Pudge if Patrolman Arzy could join Ms. Apgar at

several points during the day-long search. Sergeant Pudge repeatedly refused to allow the two patrolmen to work together, preferring the broader coverage of having them patrol separate areas. Finally, as Ms. Apgar located the escapees, a patrolman from an adjoining division directed the dispatcher to send backup, and Patrolman Burridge headed toward Ms. Apgar's position. Ms. Apgar asked Patrolman Burridge to assist by setting up a roadblock; however, she stopped the suspects prior to reaching his position. After approaching the vehicle and confirming the identity of the suspects, Ms. Apgar told the driver she was giving him a warning, she returned to her vehicle to request backup, and Patrolman Burridge arrived to help Ms. Apgar with the actual arrest of the suspects. At some point when the dispatcher informed Sergeant Pudge Ms. Apgar requested backup, Sergeant Pudge made what the dispatcher termed a "sarcastic and smart alecky" remark to the effect he would pretend to back her up from Sheridan. While Sergeant Pudge disputed Ms. Apgar's account, a tape of the day's events normally kept at the dispatch center came up missing. The Wyoming Division of Criminal Investigation conducted an extensive investigation of this incident and determined no criminal activity contributed to the disappearance of the tape and backup was not intentionally withheld from Ms. Apgar.

Ms. Apgar started to feel her life was in danger due to the lack of support

from her fellow patrolmen.  After her shift partner Patrolman Arzy was fired, Ms. Apgar began to suspect her supervisors were "trying to get rid" of her, and looking for any excuse to fire her.  Ms. Apgar claimed the constant stress of working under such conditions impacted her ability to perform her job.  Ultimately, Ms. Apgar filed a Charge of Discrimination with the Equal Employment Opportunity Commission and the appropriate state agency on March 5, 1996.  Four months later Ms. Apgar officially resigned from the Wyoming Highway Patrol effective July 10, 1996.

Ms. Apgar filed the current lawsuit on March 20, 1998, raising claims of disparate treatment based on her gender, hostile work environment sexual harassment, retaliation for engaging in a protected activity, breach of contract,[2] and intentional infliction of emotional distress.  Ms. Apgar also sued the individual defendants under 42 U.S.C. § 1983, claiming their actions violated her right to equal protection under the law.  The district court granted the defendants' motion for summary judgment, finding the behavior directed at Ms. Apgar may have been unprofessional, but it was not motivated by her gender and lacked the pervasiveness or severity to form the basis of a hostile environment claim.  The

---

[2] Ms. Apgar waives the breach of contract claim on appeal because she did not raise the issue in her opening brief.  *See State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994).

district court also determined there was no adverse employment action on which to base the retaliation and disparate treatment claims, and found a dearth of evidence in support of the § 1983 and state claims.

## II. DISCUSSION

We review the grant of a motion for summary judgment de novo, applying the same legal standard as the district court. *See Wolf*, 50 F.3d at 796. We have often pointed out summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant for summary judgment must meet the initial burden of showing the absence of a genuine issue of material fact, then the nonmovant bears the burden of pointing to specific facts in the record "showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Wolf*, 50 F.3d at 796. As stated earlier, when reviewing the grant of summary judgment we must examine the facts and any reasonable inferences therefrom in the light most favorable to the nonmoving party. *Id.*

## A. Hostile Work Environment

Title VII makes it unlawful for an employer to discriminate against any individual with respect to her terms or privileges of employment because of her sex. *See* 42 U.S.C. § 2000e-2(a)(1). Ms. Apgar relies on two theories to show a Title VII violation: disparate treatment and hostile work environment. To survive summary judgment on the hostile environment claim, Ms. Apgar "'must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Penry v. Federal Home Loan Bank*, 155 F.3d 1257, 1261 (10th Cir. 1998) (quoting *Davis v. United States Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998)), *cert. denied*, 526 U.S. 1039 (1999). Ms. Apgar must not only show she subjectively perceived the environment as hostile or abusive, but that her perception was objectively reasonable.[3] *Davis*, 142 F.3d at 1341. In order to determine whether an environment is hostile or abusive we look at a myriad of factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

---

[3] The Patrol does not dispute Ms. Apgar's subjective perception of her environment as hostile, therefore we focus solely on the objective part of the test.

performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). When reviewing a hostile environment claim on summary judgment, courts must look to the totality of the circumstances, and avoid the temptation to view allegedly discriminatory conduct in isolation. *Penry*, 155 F.3d at 1262.

The district court identified the aforementioned standards, examined the totality of the circumstances, and determined Ms. Apgar failed to point to sufficiently severe or pervasive hostility based on Ms. Apgar's gender to alter the conditions of her employment. Because we conclude Ms. Apgar has presented genuine issues of material fact on this issue, we disagree.

We begin by noting none of the allegedly discriminatory incidents involved the boorish conduct of inappropriate touching, leering, or sexual language commonly found in hostile environment claims. This fortunate fact is not fatal to Ms. Apgar's claims because actionable conduct in the Title VII realm "is not limited to behavior motivated by sexual desire." *Id.* at 1261 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). However, Ms. Apgar must still "produce evidence that she was the object of harassment because of her gender." *Id.*

The district court correctly noted the vast majority of the day-to-day events Ms. Apgar points to as discriminatory were gender neutral on their face, such as the failure to invite her to coffee breaks, not waving to her on the street, or the lack of normal conversation on the radio. The same can be said of Patrolman Goodman's "smiley face" comment and Sergeant Pudge's refusal to allow Patrolman Arzy to search for the escapees with Ms. Apgar. Having said that, it is important to point out "[f]acially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly gender-discriminatory conduct." *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999).

The district court found four incidents could be reasonably viewed as based on gender: (1) the rumor of an affair between Ms. Apgar and Patrolman Arzy; (2) Sergeant Pudge's admission he was uncomfortable around Ms. Apgar because she reminded him of his ex-wife; (3) Patrolman Clements' comments to the effect women did not belong in law enforcement; and (4) the "trooper" or "patrolman" debate waged between Ms. Apgar and Patrolman Clements. We add to this list Patrolman Clements' ponderings on what Ms. Apgar had to do to get assigned to Division C in Buffalo.

We concede at the outset this is a close case. The gender-based conduct laid out above does not appear particularly severe or pervasive when viewed in isolation and compared to the blatantly inappropriate behavior found in many hostile environment cases. *See Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 60, 68 (1986) (unwelcome sexual advances); *Davis*, 142 F.3d at 1341 (unwelcome hugging and kissing); *Smith v. Northwest Fin. Acceptance, Inc.*, 129 F.3d 1408, 1413-14 (10th Cir. 1997) (disparaging sexual remarks). However, as stated earlier, we must not view these events in isolation. *Penry*, 155 F.3d at 1262. As part of our review of the totality of the circumstances, we pay particular attention to "the setting and context in which the discriminatory behavior occurred." *Smith*, 129 F.3d at 1414. "Speech that might be offensive or unacceptable in a prep school faculty meeting, or on the floor of Congress, is tolerated in other work environments." *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1538 (10th Cir. 1995). The same can be said for conduct. Therefore, we must evaluate the evidence presented in the context of Ms. Apgar's unique work environment – patrolling the nation's highways as a law enforcement officer. *See id.* at 1537-38. When viewed from this perspective, we hold a reasonable jury could infer Ms. Apgar's co-workers and superiors made her work environment a hostile one

because she was a woman.[4]

Reviewing the evidence in the light most favorable to Ms. Apgar, we know Ms. Apgar walked into a less-than-favorable situation at Division C. Her direct supervisors told Ms. Apgar some of her co-workers were unhappy with her arrival her very first day on the job. The same supervisors changed her shift partner because other officers did not want to work with her. The supervisors told Patrolman Arzy the situation was "a delicate one," and asked him to keep them posted and keep an open mind. Considering Ms. Apgar's previous positive stint with the Patrol, it is reasonable to infer the concern within the division was based on gender animus. Patrolman Clements' belief women do not belong in law enforcement, his comments that he wondered what Ms. Apgar had done to get the assignment in Buffalo, and his insistence members of the Patrol should be identified by the title "Patrolman," and not "Trooper," only buttress the inference.

Once Ms. Apgar began her assignment she was ostracized on a daily basis.

---

[4] We note the Patrol did not ignore Ms. Apgar's complaints. Efforts were made to bring some civility to the division. Whether the Patrol can be held liable for the actions of its employees depends on whether these efforts stopped the harassment, or were reasonably calculated to do so. *See Baty v. Willamette Indus., Inc.*, 172 F.3d 1232, 1241-43 (10th Cir. 1999). We make no determination of the reasonableness of the Patrol's response because the district court did not address this issue in its decision.

-16-

Patrolman Clements was not supportive during Ms. Apgar's field training, and he later treated her poorly at the rifle range. Sergeant Pudge refused to ride with Ms. Apgar, was obviously uncomfortable around her, and was unresponsive to her questions. Ms. Apgar's co-workers did not invite her to coffee, ignored her comments on the radio, and passed her on the highway without waiving or otherwise acknowledging her. While we would have a difficult time characterizing this kind of "silent treatment" as severe and pervasive harassment in an office setting, *but see O'Shea*, 185 F.3d at 1101-02, the behavior takes on an entirely different meaning in the law enforcement context. Law enforcement officers must rely on their fellow officers while on duty – their lives literally depend on it. Given the constant threat of danger which accompanies this job, and the reliance on one's co-workers that necessarily goes with it, we think a reasonable person in Ms. Apgar's position could perceive the environment as hostile. This is especially true when considered in light of what Ms. Apgar describes as the failure to back her up during her search for the escapees.

On appeal, the Patrol tries to downplay this event by pointing out Patrolman Burridge did provide backup prior to the actual arrest of the suspects. However, Patrolman Gordon Herring, the patrolman assigned to Division B who eventually ordered dispatch to send Patrolman Burridge to Ms. Apgar's position, stated he

was "flabbergasted that patrolmen from Division C were doing their normal duties and routine traffic stops instead of going to Apgar's location to provide back up [sic]." Patrolman Herring thought Ms. Apgar's co-workers had "left her out to dry." Tina Grimes, the dispatcher on duty that day, was so concerned by Sergeant Pudge's actions she told her supervisor to pull the tape of the events because she felt something would be "coming out of what occurred." Clearly Ms. Apgar was not the only person troubled by her treatment prior to the actual apprehension of the suspects.

Finally, when Ms. Apgar did develop a positive working relationship with her shift partner, she faced rumors of an adulterous affair, and her supervisors moved her partner to a different shift. While the district court correctly pointed out the rumors impacted both Patrolman Arzy and Ms. Apgar, which limits the inference the rumors were gender-motivated, the rumors were relevant to show the overall environment in which Ms. Apgar worked. Given the totality of the circumstances, we hold summary judgment was inappropriate on this claim. Although like the district court we have reservations concerning Ms. Apgar's chances in prevailing on the merits in this case, that is not for us to decide. Ms. Apgar raises disputed questions of material fact. It is for the jury to resolve these issues. We therefore reverse and remand for that purpose.

## B. Disparate Treatment

The analysis for a disparate treatment claim, which requires proof of discriminatory intent or motive, differs from the hostile environment claim and is governed by the well-known *McDonnell Douglas* framework. *See Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1315 (10th Cir. 1999) (referring to the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this framework, Ms. Apgar

> has the initial burden of establishing a prima facie case of discrimination .... If she establishes a prima facie case, the burden shifts to [the defendants] to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. If [the defendants] offer[] a legitimate, nondiscriminatory reason for [their] actions, the burden reverts to Ms. [Apgar] to show [the] proffered reason was a pretext for discrimination.

*Bullington*, 186 F.3d at 1315-16 (citations omitted). In order to establish a prima facie case under Title VII, Ms. Apgar must show: "(1) she is a member of the class protected by the statute; (2) she suffered an adverse employment action; (3) she was qualified for the position at issue; and (4) she was treated less favorably than others not in the protected class." *Id.* (quotation marks and citation omitted). The second and fourth inquiries are at issue in this case. The district court found Ms. Apgar did not establish a prima facie case of discrimination because she failed to show she suffered an adverse employment action. We disagree, but affirm because Ms. Apgar's response to the summary judgment motion did not

-19-

contain a cite to evidence in the record tending to show unequal treatment.[5]

The only adverse employment action Ms. Apgar claims to have suffered for purposes of her disparate treatment claim is her constructive discharge from the Patrol. We have recognized constructive discharge can be a cognizable claim under Title VII. *See Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1514 (10th Cir.), *cert. denied*, 522 U.S. 1028 (1997). "In order to make out a constructive discharge claim, Ms. [Apgar] must allege facts sufficient to demonstrate under an objective test that a reasonable person would have viewed her working conditions as intolerable." *Jeffries v. Kansas*, 147 F.3d 1220, 1233 (10th Cir. 1998). "That is to say the working conditions, when viewed objectively, must be so difficult that a reasonable person would feel compelled to resign.... Essentially, a plaintiff must show that she had no other choice but to quit." *Yearous v. Niobrara County Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997) (quotation marks and citations omitted), *cert. denied*, 523 U.S. 1074 (1998).

Prior to Ms. Apgar's resignation an officer from Division J in Laramie

---

[5] We can affirm the district court on any ground for which there is a sufficient record. *See Medina v. City & County of Denver*, 960 F.2d 1493, 1495 n.1 (10th Cir. 1992).

contacted her and asked her to transfer to his division. Ms. Apgar decided not to take advantage of this lateral transfer because her husband would have had to quit two jobs he enjoyed, and she felt her mistreatment had already reached the highest ranks of the Patrol. The district court determined Ms. Apgar's refusal to request this transfer foreclosed her claim of constructive discharge. We can find no support for this conclusion in the case law, nor did the district court cite any in its decision. This is not a case of corporate restructuring where several employees were offered a transfer in lieu of termination. *See Gartman v. Gencorp Inc.*, 120 F.3d 127 (8th Cir. 1997). We hardly think it a tolerable work condition, under the facts of this case, to expect Ms. Apgar to pick up her family and move hundreds of miles in order to avoid discriminatory conduct. Such a result would effectively punish the victim for experiencing discrimination.

As we indicated earlier, this case is not a particularly strong one. "We have considerable doubt whether the [ostracism that Ms. Apgar faced was] ... so severe and intolerable that a reasonable person would have no alternative except to resign.... [T]hese are not matters to be decided on summary judgment." *Woodward v. City of Worland*, 977 F.2d 1392, 1402 (10th Cir. 1992), *cert. denied*, 509 U.S. 923 (1993). Whether the conduct in question constituted constructive discharge is a question of material fact which should be decided by a jury.

Ms. Apgar's disparate treatment claim fails despite our view of her claim of constructive discharge because her response to the summary judgment motion was entirely inadequate. As the nonmovant, Ms. Apgar was required to identify specific facts, through affidavits, depositions, or exhibits, from which a rational trier of fact could find in her favor. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). In her response, Ms. Apgar stated the Patrol argued her disparate treatment claim was flawed because she failed to show she was treated differently than men in her division. Yet her response on this issue was limited to one conclusory statement claiming "[t]here are factual disputes over whether ... she was treated less favorably than her male counterparts." The response was completely void of cites to the record tending to show disparate treatment. Neither the district court, or this Court on appeal, is obligated to comb the record in order to make Ms. Apgar's arguments for her. "The district court has discretion to go beyond the referenced portions of these materials, but is not required to do so. If the rule were otherwise, the workload of the district courts would be insurmountable and summary judgment would rarely be granted." *Adler*, 144 F.3d at 672 (citation omitted). Ms. Apgar failed to meet her burden of presenting specific facts, by reference to affidavits, depositions, or exhibits in the

record, to overcome the motion for summary judgment.[6]  Therefore we affirm the

district court's grant of summary judgment on the disparate treatment claim.

## C.  Section 1983

Ms. Apgar also brought a § 1983 claim against the individual defendants

named in her suit.  The district court mischaracterized Ms. Apgar's § 1983 claim

as one for constructive discharge, and failed to address the qualified immunity

defense raised by the defendants.  Given the quality of the summary judgment

motions on both sides of this lawsuit, we are not surprised the district court was

led astray.  We remand the § 1983 claims because the district court did not

address the claims in its decision.  As a short guideline, we note § 1983 provides

a cause of action against individuals who, acting under color of state law, violate

a person's constitutional rights:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983.  We have held sexual harassment and discrimination can result

_____

[6]  We make this determination having fully considered the evidence of gender-specific conduct discussed earlier in this opinion.

-23-

in a violation of the Fourteenth Amendment right to equal protection of the law. *See Starrett v. Wadley*, 876 F.2d 808, 814 (10th Cir. 1989). "[H]owever, ... in order to establish the state action necessary to support a § 1983 claim, [each individual defendant] had to be [Ms. Apgar's] supervisor or in some other way exercise state authority over her." *Noland v. McAdoo*, 39 F.3d 269, 271 (10th Cir. 1994); *see also David v. City & County of Denver*, 101 F.3d 1344, 1354 (10th Cir. 1996) (co-employees may act under color of law if they exercise de facto authority over victim), *cert. denied*, 522 U.S. 858 (1997). State action can occur when a supervisor "participates in or consciously acquiesces in sexual harassment ... by co-workers." *Murrell v. School Dist. No. 1*, 186 F.3d 1238, 1250 (10th Cir. 1999) (quotation marks and citation omitted). If the defendants who meet this initial criteria raise the defense of qualified immunity, plaintiffs are obligated to "show that the law was clearly established when the alleged violation occurred and come forward with facts or allegations sufficient to show that the official violated the clearly established law." *Woodward*, 977 F.2d at 1396. Should the district court determine Ms. Apgar made this showing, summary judgment would be inappropriate.

### D. Retaliation

The *McDonnell Douglas* framework applies to the Title VII retaliation

claims just as it does to the disparate treatment claim disposed of earlier. *See Jeffries*, 147 F.3d at 1231. Therefore, Ms. Apgar was first required to make out a prima facie case, which in the instance of retaliation consists of showing: "(1) protected opposition to discrimination or participation in a proceeding arising out of discrimination; (2) adverse action by the employer; and (3) a causal connection between the protected activity and the adverse action." *Id.* (quotation marks and citation omitted). "A plaintiff may maintain an action for retaliation based on participation in a protected proceeding regardless of whether the conduct forming the basis of her underlying complaint is adjudged to violate Title VII." *Id.* The district court concluded Ms. Apgar failed to establish an adverse employment action and granted summary judgment to the defendants. We must disagree and reverse.

The district court correctly stated we liberally interpret what constitutes an "adverse employment action." *See Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1264 (10th Cir. 1998). In *Gunnell*, we went so far as to state "co-worker hostility or retaliatory harassment, if sufficiently severe, may constitute 'adverse employment action' for purposes of a retaliation claim." *Id.* We do not find fault with the district court's conclusion Ms. Apgar failed to show her perceived mistreatment at the hands of her co-workers was sufficiently severe to

constitute an adverse employment action for retaliation purposes. However, we do disagree with the district court's finding Ms. Apgar's employment status was not altered in retaliation for her protected activity.

As stated earlier, we disagree with the district court's determination the necessary adverse employment action could not come from a constructive discharge of Ms. Apgar. Such a decision is for the jury. We also hold an additional avenue exists to possibly show Ms. Apgar's employment status was altered. Following Ms. Apgar's resignation, Captain Ferguson, with input from Lieutenant Coleman and Sergeant Pudge, prepared a final report concluding Ms. Apgar should not be considered for rehire with the Patrol because of her "negative attitude." In the report, Captain Ferguson described Ms. Apgar as "disruptive to the Division. Tended to be a complainer. She was negative in her views of the Highway Patrol and was constantly attempting to undermine her supervisors." Later in the report he states Ms. Apgar "had problems getting along with some of her co-workers. She did not get along with her chain of command. [She] was not happy with the way she was supervised, specifically, she did not accept criticism well." Given our liberal interpretation of "adverse employment action," and our past willingness to hold "an adverse employment action can arise from events having an adverse impact on future employment opportunities," *see*

*Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996), we hold the negative final report constitutes an adverse employment action.

Having determined Ms. Apgar suffered an adverse employment action, we must now turn to the third part of the prima facie case: whether she showed a causal connection between her protected activity and the adverse employment action. This prong is usually met by showing a temporal proximity between the two events. *Cf. Bullington*, 186 F.3d at 1320. However, in the case of the final report, we have direct evidence in the record, when read with every reasonable inference in the light most favorable to Ms. Apgar, which supports a direct causal connection. Specifically, Sergeant Pudge stated in his deposition, when asked if he agreed with the assessment of Ms. Apgar as disruptive to the division, "[w]ell, yes, sir.... The first letter that she wrote to Colonel Ayers kind of disrupted any harmony that was here." Captain Ferguson's deposition confirms in preparing the final report he adopted Sergeant Pudge's assessment of Ms. Apgar as disruptive because she wrote the letter to Colonel Ayers. Based on the limited record before us, we conclude Ms. Apgar did establish a prima facie case of retaliation. Because the Patrol has not so much as attempted to articulate a legitimate, nonretaliatory reason for the adverse employment action as required under the *McDonnell Douglas* framework, a genuine issue of material fact exists for trial as

to whether the negative final report, or Ms. Apgar's possible constructive discharge, came in retaliation for Ms. Apgar's complaints to Colonel Ayers and the Equal Employment Opportunity Commission.

### E. Intentional Infliction of Emotional Distress

Wyoming has adopted the tort of intentional infliction of emotional distress as articulated in the Restatement (Second) of Torts § 46. *See Kanzler v. Renner*, 937 P.2d 1337, 1341 (Wyo. 1997).

> To recover for intentional infliction of emotional distress, a plaintiff must prove that the defendant's conduct was extreme and outrageous and that the defendant intentionally or recklessly caused the plaintiff to suffer severe emotional harm. When presented with a motion for summary judgment, the court, as a matter of law, makes preliminary determinations regarding the outrageousness of the conduct and the severity of the emotional distress.

*Id.* (citation omitted). Under this scheme, "[o]utrageous conduct is defined as conduct which goes 'beyond all possible bounds of decency,' and which is 'regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting Restatement (Second) of Torts § 46 cmt. d). The record before us is void of any conduct which could be deemed "outrageous" under this stringent standard. "[L]iability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Restatement (Second) of Torts § 46 cmt. d. We affirm the district court's grant of summary judgment on

this issue.

### III. Conclusion

Having thoroughly reviewed the briefs of the parties and the record on appeal, we hold material facts are in dispute as to certain claims, which precludes the award of summary judgment *in toto*. We **AFFIRM** the grant of summary judgment on the state law claims and the disparate treatment claim. However, as to the hostile environment claim, the § 1983 claims, and the retaliation claim, we must **REVERSE** and **REMAND** for further proceedings consistent with this opinion.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge