UNITED STATES of America, Plaintiff,

v.

Aaron STRICKLING, Defendant.

No. 95–20079–01–JWL.

United States District Court,
D. Kansas.

April 15, 1996.

---

Michael L. Harris, Office of Federal Public Defender, Kansas City, KS, for Aaron D. Strickling and Aaron D. Strickling, Edgerton, KS, pro se.

Robin D. Fowler, Office of United States Attorney, Kansas City, KS, for the U.S.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

This matter is before the court on defendant's motion to suppress evidence (Doc. # 17). In order to fully develop the issues raised by the motion, the court has held two hearings and permitted the parties to submit supplemental briefs. After considering the entire record, the court concludes that defendant's motion must be denied.

### I. Findings of Fact

On October 10, 1995, agents of the Drug Enforcement Administration (DEA) were contacted by an animal health supply store in Tonganoxie, Kansas with information that an unknown individual wished to purchase four pounds of iodine crystals. Although iodine crystals can be used, in solution form, as an antiseptic or to clean animal hooves, usually a two ounce bottle of iodine crystals would satisfy an average user's needs for well over one year. Iodine crystals, however, are commonly associated with the manufacture of methamphetamine. An individual later identified as a Mr. Cummings did in fact purchase this unusually large quantity of four pounds of iodine crystals from the store at approximately 5:15 on that afternoon.

Drug Enforcement Agents followed the individual from Tonganoxie, Kansas to Edgerton, Kansas, where he stopped in an alley behind a residence located at 209 East Nelson, which happened to be only about one

hundred yards from the Edgerton police station. DEA agents set up surveillance there and asked the Edgerton police for help in identifying who lived there and the identity of the people that they were able to observe at the location. Defendant was identified as the resident at that location and as one of the participants in the activity occurring. He was known to one of the DEA agents as the object of a methamphetamine investigation by an area police department and to the Edgerton police officer on the scene as being a former law enforcement officer who was on parole for a narcotics violation. A check was made with the Johnson County Sheriff's Department to determine that defendant had a valid Missouri driver's license and that there were no outstanding warrants for his arrest.

During their surveillance, the agents observed Mr. Cummings carrying the iodine crystals into the residence. They also observed defendant making several trips from the residence and a garage to a 1985 gold Mazda RX–7 hatchback automobile carrying, among other things, a one-gallon milk jug, a red and white cooler, card board boxes, glass jars and a round plate. Despite some shrubbery, the agents were able to observe the site clearly and used binoculars to assist them in identifying the objects. They formed the impression, based on considerable experience and training, that it was likely that defendant had placed a portable methamphetamine laboratory in the vehicle.

Officer Steven Gillespie of the Edgerton Police Department and the DEA agents followed defendant in separate vehicles when he left the residence at 209 East Nelson in the 1985 Mazda RX–7. Officer Gillespie subsequently pulled defendant over for not coming to a complete stop at a stop sign, a minor traffic violation, at approximately 7:07 p.m. Officer Gillespie obtained defendant's driver's license and proof of insurance and returned to his car. At that time DEA Task Force Agent Steve Traglio arrived at the scene. When Agent Traglio looked into the car he quickly and readily observed plates with a white powdery substance on them located on the passenger seat, a jug with liquid located behind that seat, and behind the driver's seat, an open red and white cooler containing lye, one-half inch plastic tubing, and a gallon jug containing liquid. The lye and tubing are commonly found in connection with methamphetamine labs. Agent Traglio also smelled a chemical odor which he identified as being associated with methamphetamine coming from the open window of the car. These observations by Agent Traglio occurred within a matter of just a few minutes of the stop and over a brief duration, totalling approximately three minutes.

Defendant, having been placed under arrest and given his *Miranda* rights, was taken from the scene of the traffic stop to the Edgerton Police Station by Officer Gillespie at 7:20 p.m. Defendant's car was driven to the police station by DEA agents. Defendant subsequently signed consent to search forms allowing the DEA agents to search his car and the garage of the apartment at 209 East Nelson in Edgerton. Defendant assisted the authorities by participation in a controlled delivery of methamphetamine.

Prior to working for the City of Edgerton, Officer Gillespie worked as an uncertified deputy sheriff for Wyandotte County. At Wyandotte County, Officer Gillespie was hired to work in the detention center and to transport prisoners.

## II. *Discussion*

Defendant seeks suppression on two bases of all evidence seized as a result of the stop. First, defendant contends that, in October of 1995, Officer Gillespie was not a law enforcement officer and therefore had no authority to stop defendant for a traffic violation.[1]

---

1. The government asserts that even if Officer Gillespie were not a law enforcement officer, the evidence seized would remain admissible pursuant to the inevitable discovery doctrine. The court need not and does not address this argument. *Cf. Ball v. Renner*, 54 F.3d 664, 668 (10th Cir.1995) ("[I]t is always better for a court to address any legal issue only when it is necessary to the decision.") (citing *Ashwander v. TVA*, 297 U.S. 288, 346–47, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)). Even though this issue could provide an alternative basis for the court's ruling, if the court were to agree that the government's position had merit, especially because it implicates constitutional

Second, defendant asserts that even if Officer Gillespie was a law enforcement officer, he did not have reasonable suspicion to make the traffic stop. The court finds that neither basis justifies suppression.

### A. Certification

■ The Kansas Law Enforcement Training Act ("Act"), K.S.A. § 74–5601 *et seq.*, generally requires completion of 320 hours of accredited instruction at the Kansas Law Enforcement Training Center or at a certified state or local training school in order to gain certification, which is a prerequisite to permanent appointment as a full time police officer or law enforcement officer. K.S.A. § 74–5607a. When a person is not certified as required, the Act allows for appointment on a provisional basis for not more than one year. K.S.A. § 74–5607a(c)(1). If the officer does not receive his or her certification within that one year, the officer shall forfeit the position and cannot be reappointed on a provisional basis within one year following the date on which the person last served as a police officer or law enforcement officer. *Id.*

The City of Edgerton hired Officer Gillespie as a provisional law enforcement officer in January of 1995. Prior to his work in Edgerton, Officer Gillespie worked as a deputy sheriff in Wyandotte County from July 1, 1992 until January 25, 1995. During his time at Wyandotte County, Officer Gillespie was not certified. Consequently, defendant contends that Officer Gillespie could not be a provisional law enforcement officer for Edgerton until January 25, 1996, one year after he completed his work for Wyandotte County. Officer Gillespie, continues defendant, therefore had no authority to stop defendant on October 10, 1995. *See* K.S.A. § 22–2403 (stating that a private citizen is not authorized to stop a vehicle for a traffic violation). Because the court concludes that Officer Gillespie was not a "law enforcement officer" while working for Wyandotte County, defendant's argument must be rejected.

The Act defines a police officer or law enforcement officer as any "full or part time salaried officer or employee of the state, a county or a city, whose duties include the prevention or detection of crime and the enforcement of the criminal or traffic laws of this state or of any municipality thereof." K.S.A. § 74–5602(e). That definition includes "the sheriff, undersheriff, and full-time or part-time salaried deputies in the sheriff's office in each county." *Id.*

Officer Gillespie was commissioned as a deputy sheriff. He worked in the county detention center and transported criminals. It is reasonable to infer that Officer Gillespie's duties included preventing the escape of prisoners from the detention center or from the transport vehicle. Escaping from custody is a crime. K.S.A. §§ 21–3809 and 21–3810. Thus, Officer Gillespie's duties included the prevention of crime and the enforcement of the criminal laws of Kansas. He therefore falls within the general definition of a law enforcement officer.

After generally defining law enforcement officer, however, the Act expressly excludes several categories of persons who might meet the general definition. Relevant to this case is the correctional duties exclusion, which covers "any employee of a city or county who is employed solely to perform correctional duties related to jail inmates and the administration and operation of a jail." K.S.A. § 74–5602(e). Individuals falling within this exclusion are not law enforcement officers. Whether or not Officer Gillespie worked as a law enforcement officer for Wyandotte County turns on the scope of this exclusion.

As has been stated by the Kansas Supreme Court, "[i]t is a fundamental rule of statutory construction, to which all other rules are subordinate, that the intent of the legislature governs if that intent can be ascertained. When a statute is plain and unambiguous, the court must give effect to the intent of the legislature as expressed rather than determine what the law should or should not be." *Tompkins v. Bise*, 259 Kan. 39, 910 P.2d 185, 188 (1996) (citations omitted).

Although certain provisions of the Act are neither plain nor unambiguous, the correctional duties exclusion does provide clear

considerations the court declines to reach it        nonetheless.

guidance on at least one important point. The phrase "employed solely to perform" unambiguously signifies that the scope of the correctional duties exclusion turns not on what an individual was employed as, but rather what he or she was employed to do. In other words, whether or not one falls within the exclusion does not depend on the title of the position. Thus, an individual employed as a "corrections officer" would not automatically come within the correctional duties exclusion. Similarly, a "deputy sheriff" could qualify for the exclusion if he or she were "employed solely to perform" certain duties.

When assuming his position, Officer Gillespie swore the same oath sworn by officers patrolling the streets: to uphold the laws of the state of Kansas. Pointing to this oath, defendant contends that Officer Gillespie does not qualify for the correctional duties exception because he could be asked to perform noncorrectional duties. Although the court agrees that Officer Gillespie could perform noncorrectional duties without breaking his oath, the court disagrees that this potential occurrence prevents Officer Gillespie from qualifying for the correctional duties exclusion.

█ If the correctional duties exclusion does not apply merely because an individual's duties might be modified, then governmental entities would be forced to certify any uncertified employee whose duties might change someday due to, for example, promotion or the changing needs of the employer. Otherwise, those employees could not be asked to perform noncorrectional duties after their first (provisional) year on the job. K.S.A. § 74–5607a(c)(1). Not only would such large scale certification impose considerable expense on governmental entities, in all likelihood it would be impracticable. According to the testimony elicited at the second hearing, there are not enough vacancies in the training programs to accommodate those presently seeking certification. For example, Officer Gillespie testified that his lack of certification while employed at both Wyandotte County and Edgerton stemmed from the lack of space in the academy. The court must assume that the legislature was aware of the impracticability of large scale certification and did not intend the correctional duties exclusion to, in effect, impose such a requirement. Thus, the court concludes that whether or not Officer Gillespie falls within the correctional duties exclusions depends on what his duties were when he was hired, not what they could become over the course of his employment.[2]

Officer Gillespie was employed to work in the detention center and to transport prisoners. Charles Brooks, the training officer of the Wyandotte County Sheriff's Department, testified that when uncertified individuals were hired, they worked in the detention center, until and unless they were selected for law enforcement training. This testimony was uncontroverted. Defendant does not dispute that working in the detention center is a correctional duty related to jail inmates. Instead, defendant focuses on the transportation of prisoners. Defendant maintains that Officer Gillespie's transportation duties were not correctional duties related to jail inmates because he carried a firearm. The court disagrees.

The purpose of the Act is to improve law enforcement personnel and procedures. *See* K.S.A. § 74–5603(a). Categorizing as law enforcement officers those who carry a firearm and transport prisoners, defendant reasons, furthers the purpose of the Act because those individuals are in contact with the public.

█ The court agrees that requiring deputies who carry a firearm and transport prisoners to receive some level of training is clearly desirable.[3] Having said that, the court doubts whether a transporting officer is in regular contact with the public in the way a patrol officer is. Moreover, and more

---

2. This conclusion is consistent with the meaning of "employ," which Webster's Ninth Collegiate Dictionary defines as "to use or engage the services of" or "to provide with a job that pays wages or a salary."

3. Evidence introduced at the hearing established that corrections officers in general and Officer Gillespie in particular attended frequent training sessions.

importantly, the court cannot agree that the statutory question of whether a duty is correctional or relates to jail inmates turns on whether the person undertaking that duty carries a firearm. The language of the correctional duties exclusion nowhere mentions firearms. In marked contrast, the scope of the next exclusion to the law enforcement officer definition does turn in part on whether or not the individual carries a firearm. The Act excludes:

> any full-time or part-time salaried officer or employee whose duties include the issuance of a citation or notice to appear provided such officer or employee is not vested by law with the authority to make an arrest for violation of the laws of this state or any municipality thereof, *and is not authorized to carry firearms when discharging the duties of such person's office or employment.*

K.S.A. § 74–5602(e) (emphasis supplied). This language demonstrates the legislature's ability to limit the scope of an exclusion on the basis of firearms. The legislature's choice not to incorporate similar language into the correctional duties exclusion indicates the legislature's intent to not limit the exclusion's scope in that manner.

This court believes that the Kansas Supreme Court would utilize the tenets of statutory construction cited above, recognize the legislature's intent, and conclude that Officer Gillespie's duties while employed with Wyandotte County brought him squarely within the correctional duties exclusion. Thus, he did not become a provisional law enforcement officer until he became employed by Edgerton in January of 1995. Officer Gillespie therefore had the statutory authority to stop defendant in October of 1995.

### B. *Reasonable Suspicion*

■ Although a traffic stop is a seizure within the meaning of the Fourth Amendment, it is more analogous to an investigative detention than a custodial arrest. *United States v. Botero–Ospina*, 71 F.3d 783, 786 (10th Cir.1995). As a result, ordinary traffic stops are analyzed according to the principles set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Botero–Ospina*, 71 F.3d at 786. Under *Terry*, a

court makes a two-fold inquiry in order to determine the reasonableness of the investigative detention: first, was the officer's action justified at its inception and second, was the officer's action reasonably related in scope to the circumstances which justified the interference in the first place. *Id.* The court finds that the traffic stop complied with *Terry*.

■ The Tenth Circuit has recently stated that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *Id.* at 787. It is irrelevant that the officer may have had other subjective motives for stopping the vehicle; the sole inquiry is whether the officer had reasonable suspicion that this particular motorist violated "any one of the multitude of applicable traffic and equipment regulations" of the jurisdiction. *Id.* (quoting *Delaware v. Prouse*, 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979)). Both parties agree that, in light of *Botero–Ospina*, if a traffic violation occurred, the stop was justified at its inception.

■ Officer Gillespie testified at the initial hearing that defendant did not come to a complete stop in violation of Kansas law. K.S.A. § 8–1528. This testimony was uncontroverted. Although defendant indicates in his papers that other vehicles were present at the intersection, no witness offered testimony contrary to Officer Gillespie's. Although Officer Gillespie's evident eagerness to be involved with the DEA's investigation and apprehension of defendant causes the court to view Officer Gillespie's testimony with a critical eye, the preponderance of the evidence simply compels the conclusion that defendant did commit a traffic violation. As a result, the stop was justified at its inception.

■ The second prong of the *Terry* analysis is also satisfied. An officer making a routine traffic stop may issue a citation or warning. *United States v. Jones*, 44 F.3d 860, 872 (10th Cir.1995); *United States v. Soto*, 988 F.2d 1548, 1555 (10th Cir.1993).

Officer Gillespie stopped defendant's car, took defendant's license and returned to his patrol car in order to write a citation. Defendant argues that, because Officer Gillespie had checked on the validity of defendant's license prior to the stop, the scope of the detention was excessive. Presumably, however, Officer Gillespie needed information from the license to issue the ticket. Even if he did not, retaining defendant's license for the short period necessary to issue a citation does not render the detention period unreasonably related in scope to the circumstances which justified the interference in the first place—a traffic violation. Rather, such retention helps ensure that a driver does not drive away while the officer is writing the citation. Further, within the few minutes necessary to issue a citation, Agent Traglio arrived and sensed the evidence,[4] which gave him probable cause to believe that defendant was carrying a portable methamphetamine lab. Defendant was immediately placed under arrest. Under these circumstances, the court concludes that the second prong of the analysis mandated by *Terry* is satisfied. The evidence found in defendant's car was therefore the fruit of a lawful *Terry* stop conducted by an authorized law enforcement officer. Suppression would be inappropriate.

### III. *Order*

**IT IS THEREFORE BY THE COURT ORDERED** that defendant's motion to suppress evidence (Doc. # 17) is denied.

**IT IS SO ORDERED.**

---

4. See section I, *supra,* for a description of the evidence sensed by Task Force Agent Traglio. The court readily concludes that such evidence gives rise to probable cause, a conclusion defendant does not dispute.