**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 10, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DAVID CARDON,

     Plaintiff - Appellant,

v.

TESTOUT! CORPORATION, a Utah
corporation; DIRECT LIST
SERVICES, INC., a Utah corporation;
MOUNT FRANKLIN HOLDING
COMPANY, L.L.C., a Utah limited
liability company; NOEL VALLEJO;
DOUGLAS EDWARDS; SQUIRE &
COMPANY, P.C., a Utah corporation,

     Defendants - Appellees.

Nos. 06-4091 & 06-4126
(D.C. No. 2:04-CV-873-PGC)
(D. Utah)

---

**ORDER AND JUDGMENT**[*]

---

Before **LUCERO**, **MURPHY**, and **ROBINSON**,[**] Circuit Judges.

David Cardon brought suit against TestOut! Corporation ("TestOut!"),

Direct List Services, Inc. ("DLS"), Mount Franklin Holding Company, L.L.C.

("Mount Franklin"), Noel Vallejo, and Douglas Edwards ("defendants"), alleging

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

[**] The Honorable Julie A. Robinson, United States District Court Judge,
District of Kansas, sitting by designation.

claims under federal and state securities law and state common law. These claims arise from Cardon's sale of his stock in Testout!, DLS, and Mount Franklin ("companies") to Vallejo in August 2001. Cardon alleges that defendants made fraudulent misrepresentations and omissions regarding the true profitability of the companies during sale negotiations in 2001. The district court granted summary judgment to defendants on Cardon's claims under federal and state securities law, and on his claims of fraud, negligent misrepresentation, and quantum meruit[1] under Utah common law. It declined to exercise pendent jurisdiction over the remaining state law claims, and dismissed these without prejudice. Cardon now appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we **AFFIRM** the district court's grant of summary judgment with respect to the federal securities claims. With respect to the fraud, negligent misrepresentation, and state securities claims, we **VACATE** the judgment of the district court with instructions to dismiss without prejudice. We **AFFIRM** the district court's dismissal without prejudice of Cardon's remaining state law claims. Finally, we **REVERSE** the court's award of attorneys' fees to the defendants.

# I

In the early 1990s, David Cardon and Noel Vallejo entered into a partnership named United Education Centers, which specialized in marketing

---

[1] Cardon does not appeal the dismissal of his quantum meruit claim.

educational products.  Their partnership was governed by the United Education

Centers Partnership Agreement ("Partnership Agreement"), dated July 20, 1992.

The Partnership Agreement includes an Ownership Clause that allows for a

gradual transfer of ownership from Vallejo to Cardon, provided that Cardon

stayed on as a partner, with Cardon's share reaching a forty percent interest on

January 1, 1997.  It also contains a Leaving Clause that stipulates the following:

> When either partner decides to leave United Education Centers, the
> remaining partner will buy the ownership interests of the leaving
> partner based on the previous year's net income and according to the
> following factors:
>
> July 1, 1992 through December 31, 1992:
> No buy out will occur due to 100% ownership by Noel Vallejo.
>
> January 1, 1993 through December 31, 1993:
> One times the net income for the year 1992 times the percent
> ownership.
>
> January 1, 1994 through December 31, 1994:
> Two times the net income for the year 1993 times the percent
> ownership.
>
> January 1, 1995 through December 31, 1995:
> Five times the net income for the year 1994 times the percent
> ownership.

In 1993, Cardon and Vallejo incorporated United Education Centers, Inc.

("UEC").  During UEC's February 1993 organizational meeting, UEC issued

5,000 voting shares of stock each to Vallejo and Cardon, 36,250 non-voting

shares to Vallejo, and 3,750 non-voting shares to Cardon.  In addition, Cardon

voluntarily entered into an Officer's Employment Agreement ("Employment

Agreement") with UEC that required him to sell all of his UEC shares upon his resignation. Neither UEC's Articles of Incorporation nor the minutes of the organizational meeting provided for Cardon to receive additional shares in the future. Yet Cardon's stock ownership in UEC grew yearly according to the formula set forth in the Partnership Agreement, until he owned forty percent of the company in 1997.

In May 1998, Vallejo and Cardon formed two other corporations: DFS, which purchased mailing lists mainly from UEC; and Mount Franklin, which held the real estate associated with UEC's business. That same year, UEC changed its name to TestOut! Corporation. TestOut! had a very volatile income stream during the late 1990s. Although 1998 was a very successful year, TestOut! suffered a stockholder's deficit of approximately $1 million in 1999. This business environment strained Cardon's relationship with Vallejo, and in December 1999, Cardon told Vallejo he wanted to resign or split up the company. In fact, Cardon stayed with the company for the first half of 2000 in order to ease the company's transition to operating without him. TestOut!'s losses continued during this time.

On June 12, 2000, Vallejo presented Cardon with a letter that gave him three options in light of his expressed desire to leave the company. Option One states, "[Cardon] sells his shares to [Vallejo] by exercising the current written agreement." Option Two offered Cardon the opportunity to continue to work with TestOut!, and Option Three provided for Vallejo to purchase Cardon's shares and

voting rights for $640,000 in exchange for Cardon's commitment not to compete with TestOut! for three years.

On June 14, 2000, Mr. Cardon tendered his voluntary resignation from the company in a letter, which stated:

> I hereby resign as a Director and Corporate Secretary of TestOut! Corporation, Direct Lists Services, Inc., and Mount Franklin Holding Company, L.L.C.
>
> With my resignation, I give to you my voting shares in these companies and sell all of my stock in these companies to you pursuant to the terms of our buy-sell agreement. This document is also used as written notification of termination of all Employment Agreements between myself and the companies listed above.

The parties dispute whether a buy-sell agreement existed at the time Cardon resigned. TestOut! claims that the Partnership Agreement's leaving clause governed the terms by which Cardon was obligated to sell his shares to the companies. Cardon asserts that UEC's incorporation rendered the Partnership Agreement's leaving clause a nullity, and that no buy-sell agreement was in place when he resigned. Parties agree, however, that the Employment Agreement required Cardon to sell his shares upon his resignation.

Because TestOut! was organized as a subchapter S corporation, Cardon bore personal tax liability for the company's income in proportion to his ownership. TestOut!'s practice was to make distributions to Cardon to cover his personal tax liability. As 1998 was a profitable year for TestOut!, Cardon incurred large personal taxes for that year. Unfortunately, TestOut! did not file

its 1998 taxes until after Cardon resigned in June 2000. Cardon therefore was unable to collect any reimbursement from TestOut! for his 1998 personal taxes. In negotiating with the Internal Revenue Service ("IRS") and the Utah State Tax Commission an offer in compromise of his tax troubles, Cardon represented that he no longer had any interest in the company. For example, in a letter to the IRS dated April 10, 2001, Cardon wrote:

> TestOut! Corporation did not file its 1998 taxes until August, 2000. This late filing brought an enormous financial burden to my wife and I because I had already resigned my shares and position at TestOut! Corporation (I resigned in June, 2000) and I therefore have no money from TestOut! to pay this 1998 tax.

In a second, undated letter to the Utah State Tax Commission, Cardon wrote: "In 1998, I was a 40% owner of TestOut! Corporation. . . . However, by the time that TestOut! accountants finally completed the 1998 tax information in August, 2000, I had already resigned my position and shares of the company. My resignation date was June 14, 2000." Based in part on these representations, the IRS accepted Cardon's offer in compromise and the Utah State Tax Commission waived penalties. Additionally, in a draft letter dated January 9, 2001, to Steve Tingley at Ray Quinney & Nebeker,[2] Cardon wrote, "On June 14, 2000, I resigned my position at TestOut! Corporation and sold my 40% ownership to Noel Vallejo for $0.00." Cardon modified the draft and sent out a final version that did not

---

[2] This letter served to explain Cardon's decision not to sign as a guarantor for a renegotiated loan owed by TestOut! to First Security Bank.

refer to a sale of ownership for $0.00.  This modified letter instead stated, "In June, 2000, I received an ultimatum from Noel Vallejo that resulted in my resignation as a Director of the company.  I received no compensation from Noel for my 40% ownership."

Notwithstanding the above representations, Cardon continued to negotiate the sale of his shares with Vallejo through 2001.  On May 30, 2001, Vallejo sent Cardon a letter stating:

> The buy-out formula per our agreement is as follows:  When either partner decides to leave TestOut, the remaining partner will buy the ownership interests of the leaving partner based on the previous year's net income and according to the following factors:  Five times the net income for the year 1999, times the percent of ownership.
>
> TestOut's net income in 1999 = <$1,155,222> x 5 x 40% = 0
> Direct List Services net income in 1999 = <$21,065> x 5 x 40% = 0
> Mount Franklin's net income in 1999 = $6,933 x 5 x 40% = $13,866

Vallejo also agreed to pay Cardon $69,495 for Cardon's TestOut!-related tax liability (including penalties and interest).  In response, Cardon wrote Vallejo, explaining his position that the buy-out formula from the leaving clause of the Partnership Agreement did not control.  That letter, dated June 13, 2001, states:

> A Corporation is not a Partnership and a Partnership is not a Corporation.
>
> The Partnership Agreement signed on July 20, 1992 is specifically titled "United Education Centers Partnership Agreement."  This Agreement also states "Partnership: Noel Roberto Vallejo and David Charles Cardon" on the first page.  My point is that this Agreement pertained to our partnership between July 20, 1992 and February 17, 1993.

-7-

. . . .

I am prepared to sell my stock in TestOut! and Direct List Services as required by my Officer's Employment Agreements with these Corporations. But you and I have not created a Corporate Buy-Sell Agreement for these Corporations. This Corporate Buy-Sell Agreement is specifically called for in both of my Officer's Employment agreements as the mechanism for selling my non-voting stock. Therefore, you and I need to create and sign a Corporate Buy-Sell Agreement before I sell my stock in these Corporations.

In response, Vallejo wrote, on June 29, 2001:

Dear David,

I was disappointed when I read your letter dated June 13, 2001. To say that we do not have a buy-sell agreement (July 20, 1992 United Education Centers Partnership Agreement, Leaving Clause) is to take away the fundamental and guiding principles we used throughout our business. I call upon your personal integrity and your honesty to uphold our buy-sell agreement.

. . . .

Although we incorporated United Education Centers on February 17, 1993 we used the partnership agreement created on July 20, 1992 to transfer ownership to you on a graduated scale from July 1, 1992 through January 1, 1997. To now say that this agreement is not valid because it refers to a partnership is not correct. We used this agreement in all aspects of our business relationship as owners of the company, from determining the ownership schedule, the commission schedule, compensation rate and for determining the buy-out formula upon termination of an owner.

. . . .

Please lets live up to what we have agreed to in our buy-sell agreement.

Vallejo followed up the letter with a draft agreement for the sale of Cardon's shares that explicitly incorporated the leaving clause of the Partnership Agreement, and offered $13,866 for the sale of all of Cardon's shares in the companies per that clause ($13,866 for Mount Franklin and $0 for TestOut! and

-8-

DLS). Cardon declined to sign this draft agreement, and instead sent a letter noting "a difference of opinion regarding our Buy-Sell Agreement," and requesting, among other information, financial statements for TestOut!, DLS, and Mount Franklin for the years 2000 and 2001 (year to date). Vallejo refused to provide financial information beyond the date that Cardon resigned from the company. He believed that because Cardon resigned in June 2000, he was not entitled to the companies' financial information after that date.

At some point during the negotiations, Doug Edwards, then-Chief Financial Officer of TestOut!, spoke with Cardon to encourage him to cooperate and communicate in the negotiation to sell his shares. Edwards refused to provide current information on the company's valuation, and, according to Cardon, told him that it would be too difficult and time-consuming to provide written financial statements. Edwards did, however, provide Cardon an "oral overview," and stated the companies were over $3 million in debt and had almost closed their doors in December 2000. Because Edwards and Cardon were friends, Cardon trusted his representations. Although he had contacted lawyers about the possibility of compelling arbitration, Cardon decided not pursue that option.

Instead, on August 2, 2001, Cardon entered into an agreement in which he sold his shares in the companies to Vallejo for $15,868 ("Sale Agreement"). This figure reflects the $13,866 offer made by Vallejo for Cardon's Mount Franklin

stock in addition to $2,000 for his TestOut! and DLS shares.[3] Cardon concluded that he was owed $2,000 for his stake in the latter two companies based on the organizational meeting minutes for the corporations, which he claimed valued his stock at a minimum of $1,000 per corporation. None of the clauses of the Sale Agreement refer to the Partnership Agreement.

The Sale Agreement also provided for a payment of $74,207.15 by Vallejo to Cardon to cover Cardon's personal tax liability. Cardon negotiated for this payment without informing Vallejo that the IRS had accepted a compromise offer that significantly reduced his tax liability. Additionally, Cardon released all claims against the companies, their officers, agents, employees, and, specifically, Vallejo in the Sale Agreement, and agreed to pay attorneys' fees in event of a breach.

At some point in 2003, Cardon learned that the companies' financial performance greatly improved in 2001. He subsequently filed this suit against the defendants, claiming that, based on the companies' improvement in 2001, his shares were worth approximately $5 million at the time of sale. He alleges that defendants knew the companies' finances had improved when they negotiated the Sale Agreement and intentionally failed to disclose this information to him. He seeks redress under Section 10(b) of the Securities Exchange Act of 1934, 15

---

[3] The record does not reveal a reason why the Agreement price of $15,868 is $2 greater than the sum of $13,866 plus $2000. We deem this discrepancy non-material.

U.S.C. § 78j(b), Securities and Exchange Commission Rule 10b-5 thereunder, Utah Code § 61-1-1, et seq., and various common law causes of action.

After both parties conducted discovery, defendants filed a motion for summary judgment on December 23, 2005. On March 22, 2006, the district court granted the motion with respect to Cardon's state and federal securities law claims, and also granted summary judgment on his fraud, negligent misrepresentation, and quantum meruit claims. It declined to exercise pendent jurisdiction over the remaining claims, dominated by state law, and ordered those claims dismissed without prejudice. Because Cardon had breached the Sale Agreement by filing suit, the court awarded attorneys' fees to defendants. Cardon appeals the grant of summary judgment to defendants on his federal and state securities claims and his fraud and negligent misrepresentation claims, as well as the award of attorneys' fees.

## II

We review the district court's grant of summary judgment de novo, applying the same legal standard as the district court. Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1216 (10th Cir. 2002). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing cases on summary judgment, "we view

the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." Roberts v. Printup, 422 F.3d 1211, 1214 (10th Cir. 2005).

**III**

We first consider Cardon's claims under § 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.  Section 10(b) of the 1934 Act makes it unlawful "for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j.  Rule 10b-5 in turn provides:  "It shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.  We have stated that the elements of a Rule 10b-5 claim are:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1095 (10th Cir. 2003) (emphasis omitted).  A misrepresentation or omission is material if there is a substantial

-12-

likelihood that a reasonable investor would have considered the relevant information significant in deciding whether or not to go ahead with the securities transaction. See Basic Inc. v. Levinson, 485 U.S. 224, 231-232 (1988).

We have previously explained that a material omission must be "manipulative" or "deceptive" in order to form the basis of a Rule 10b-5 claim:

> The SEC's authority to proscribe material omissions under Rule 10b-5 cannot exceed the power granted to it under Section 10(b) of the Securities and Exchange Act of 1934. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 214 (1976). Section 10(b) empowers the SEC to promulgate rules only with respect to "manipulative" and "deceptive" trading practices. 15 U.S.C. § 78j(b). Accordingly, only those material omissions which qualify as manipulative or deceptive practices may properly be considered to fall within the purview of Rule 10b-5.

Jensen v. Kimble, 1 F.3d 1073, 1077 (10th Cir. 1993). In that case, the plaintiffs (including Jensen and several related parties) sold a large portion of their shares in a public corporation to defendant Kimble for a below-market price. Kimble had represented to Jensen that the sale of those shares was necessary to effectuate a potentially lucrative merger deal. Id. at 1075. Kimble explicitly told Jensen that he could not reveal the nature of the deal, the identity of the merger partner, or the identity of those who would receive plaintiffs' stock following the sale. Id. When profits from the merger deal failed to materialize, Jensen brought suit against Kimble, alleging in part that Kimble's material omissions with respect to the nature of the deal, the identity of the merger partner, and the identity of the

-13-

stock purchases violated Rule 10b-5. Id. at 1076. We held that these omissions could not form the basis of a Rule 10b-5 claim, and reasoned as follows:

> These affirmative statements by Kimble clearly notified Jensen that Kimble was not disclosing certain information with respect to the Sage Court deal and with respect to the proposed stock transaction to be performed by Jensen. In other words, by virtue of the disclosures that Kimble did make, Jensen knew what he didn't know. Under these circumstances, even assuming arguendo that a special relationship of trust existed between Jensen and Kimble, we do not believe it can be said that Kimble's omissions misled Jensen with respect to any of Kimble's other remarks. Accordingly, even viewing the evidence in the light most favorable to the plaintiffs, we conclude that Kimble's omissions were neither manipulative nor deceptive within the meaning of Rule 10b-5 and thus are not actionable under this rule.

Id. at 1078.

Cardon's claims center on the failure of Vallejo and Edwards to provide him with information about the company's (improving) financial performance in 2001. Yet, Cardon readily admits that he entered into the Sale Agreement knowing that he was unaware of the company's financial condition from the date of his resignation onward. Thus, like Jensen, Cardon "knew what he didn't know." Id. Cardon has not shown that any of the statements Edwards made with respect to the Company's debt or its prospects in December 2000 were false. Instead, he claims that these statements were misleading in light of the material omissions regarding TestOut!'s 2001 performance. Our decision in Jensen is dispositive. As described by Cardon, Edwards' statements were not manipulative or deceptive as required under Rule 10b-5. Because we have determined that

-14-

Cardon's claims fail for this reason, we need not reach a decision on transaction causation, justifiable reliance, or materiality – the three alternate grounds relied on by the district court to find for defendants on Cardon's securities claims. Because there is no underlying violation of the Securities Exchange Act, Cardon's claim against Vallejo under 15 U.S.C. § 78t(a) also fails. See City of Philadelphia v. Fleming Cos., 264 F.3d 1245, 1270 (10th Cir. 2001).

In conclusion, the district court's dismissal of the federal securities claims was proper, and no federal question remains.

## IV

Cardon argues the district court erred in dismissing with prejudice his state claims based on Utah securities law, and common law fraud and negligent misrepresentation. Federal courts must carefully exercise their discretion when hearing state claims based on pendent jurisdiction. United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); see also 28 U.S.C. § 1367(c)(3). The interests of the parties, judicial economy, and comity must be considered. Gibbs, 383 U.S. at 726. Under normal circumstances, these factors counsel in favor of dismissing state law claims without prejudice if the federal claims are dismissed before trial. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988); Ball v. Renner, 54 F.3d 664, 669 (10th Cir. 1995). When a district court dismisses state law claims with prejudice in such circumstances, this court has not hesitated to

-15-

remand with instructions to dismiss without prejudice.  See, e.g., Bauchman v. W. High Sch., 132 F.3d 542, 549-50 (10th Cir. 1997).

In this case, although it dismissed most of Cardon's state law claims without prejudice, the district court dismissed Cardon's fraud, negligent misrepresentation, and state securities claims with prejudice.  After holding as a matter of law that Cardon could not show justifiable reliance with respect to his federal securities claim, the court reasoned that his fraud and negligent misrepresentation claims – each of which require proof of justifiable reliance – must also fail.  It further held that Cardon's state securities claims fail because the alleged misrepresentations and omissions were not material.

We hold that the court abused its discretion in reaching the merits of these state claims.  As a matter of comity, Utah may define for itself what constitutes justifiable reliance and materiality, particularly in the tricky area of misrepresentation by omission – given that a price for Cardon's stock had not been set nor a methodology established for such determination.  We also note that Cardon will not be unfairly prejudiced as a result of this ruling, as Utah law extends its statutes of limitations to allow refiling of claims such as his.  See Utah Code § 78-12-40.  Accordingly, we vacate the judgment of the district court with respect to Cardon's fraud, negligent misrepresentation, and state securities claims with instructions to dismiss without prejudice.

**V**

Finally, Cardon appeals the district court's award of attorneys' fees to defendants under the terms of the August 2, 2001 agreement. "We review the district court's award of attorney fees for an abuse of discretion, but review the underlying legal analysis de novo." Hofer v. UNUM Life Ins. Co., 441 F.3d 872, 884 (10th Cir. 2006) (citation omitted).

The district court awarded attorneys' fees to defendants based on a written provision in the parties' Sale Agreement, which provided that "the defaulting party shall pay all costs incurred by the other party in enforcing the terms hereof including reasonable attorneys' fees." By bringing the instant suit, the court held that Cardon was in default of the Release of Claims provision of the agreement and that defendants were thus entitled to reasonable attorneys' fees incurred in defending the suit.

Cardon contests this award, arguing that the fee-shifting provision of the August 2, 2001 agreement is unenforceable because the agreement was induced by fraud. See Bennett v. Coors Brewing Co., 189 F.3d 1221, 1229 (10th Cir. 1999) ("Under general contract principles, it is well established that a contract is void and unenforceable if procured through fraud."). Because we have remanded Cardon's fraud claim with instructions to dismiss without prejudice, the question of whether Cardon was fraudulently induced remains undecided. In light of Utah's strong interest in determining for itself the knotty fraud issues involved in

-17-

this case, we conclude that the proper forum for determining whether defendants are entitled to an award of attorneys' fees under the contract is state rather than federal court.[4] We therefore reverse the district court's award of attorneys fees.

ENTERED FOR THE COURT

Carlos F. Lucero
Circuit Judge

---

[4]We note that it is an open question whether the attorneys' fees awarded to defendants in this case were in fact incurred in "enforcing" the terms of the contract. We consider it an oddity that defendants never sought to enforce the Release of Claims provision through a counterclaim against Cardon; defendants merely asserted their entitlement to fees based on a successful defense of the suit in the lower court. Because we reverse the award of attorneys' fees on the fraud issue, however, we need not decide whether the fees were in fact incurred in enforcing the terms of the agreement.